**CORZELIUS et al. v. HARRELL.**

No. 9409.

Court of Civil Appeals of Texas. Austin.

March 15, 1944.

420

Black, Graves, & Stayton and John W. Stayton, all of Austin, for appellants.

R. M. Thornton, Jr., of Houston, and Hornsby, Hornsby, & Kirk, of Austin, for appellee.

McCLENDON, Chief Justice.

Appeal from a final judgment setting aside an original order of the Commission (Railroad Commission of Texas) and various extensions thereof which limited the gas withdrawals for light and fuel purposes from the Bammel field in Harris County to 20,000,000 cubic feet per day, and prorated gas withdrawals from the field in accordance with a stated formula, but provided that the formula "shall apply only after the net daily volume of gas produced, averaged over a thirty (30) day period, has exceeded an amount of nineteen million (19,000,000) cubic feet." The judgment also permanently enjoined the Commission from continuing in effect these orders and "from entering or continuing in effect any similar orders." Corzelius, one of the two sole producers in the field, was enjoined from producing under the orders or similar ones. The suit was by Harrell, the other producer, against the Commission in the nature of an appeal to set aside the orders. Corzelius and Meincke (one of his lessors) intervened. The judgment was by the court, who took the case from the jury after the evidence was concluded. The appeal is by the interveners only.

The controlling issue in the case concerns the validity of the above-quoted proviso of the orders, which issue in turn involves the question whether, under the factual situation presented, it was the mandatory duty of the Commission to prorate the actual production or market demand from the field prior to the time when that production should reach 19,000,000 cubic feet. For convenience, we shall use the abbreviation MMCF for million cubic feet.

The record is quite large, including over 600 pages of statement of facts and numerous original exhibits sent up with the record. It will be necessary, however, to state only in broad outline what we regard as the salient facts, which are these:

The Bammel field was classed as primarily a gas field. The sands were located some 6,100 feet below sea level, and the proven area covered about 3,200 acres. Along its southern edge was a long narrow strip of oil sand of about 260 acres. Prior to October, 1941, the Harrell holdings covered practically the entire field. In that month his leases covering 79 acres (about 4.1% of the field) lapsed, and this acreage was acquired by Corzelius (partly in fee and partly under two leases). Corzelius drilled one well on his holdings and began production, as below detailed, about January 10, 1942. In 1939 Harrell obtained an order from the Commission authorizing him to put in a recycling plant. This plant had a capacity of 35 MMCF per day. The gas was piped from his various production wells (15 in all) to a centrally located plant where the liquids were extracted and the residue (33 MMCF of dry gas) was reinjected into the gas reservoir through two injection wells located near the center of the field; the result of this process being a net loss in volume of gas from the reservoir of 2 MMCF per day. Under this process the liquids (distillates) extracted amounted to about 25 barrels per 1 MMCF of gas processed, having a value at the time of the trial of $1.40 per barrel. Harrell had a pooling agreement with his several lessors under which the proceeds from the distillates produced from the recycling operation were apportioned in accordance with a stated formula. The effect of this recycling process was to draw the wet (sweet) gas from the 15 wells and to replace it in the reservoir with dry gas to the extent stated. The dry gas would thus spread out in all directions from the two injection wells, and gradually force the wet

gas to the area depleted by the production wells. This process would not be entirely uniform, but there would be fingering of dry gas into the wet gas area and a certain amount of commingling of dry and wet gas, thus reducing the amount of liquids in the admixture. Thus the production from the producing wells would gradually contain a lower percentage of liquids until, through the process of recycling, that percentage should reach a point where recycling would be unprofitable. And thus the reservoir would eventually contain only practically dry gas, without any loss of pressure in the reservoir, except that resulting from the net loss of gas volume through the recycling process. It was Harrell's purpose not to market any gas from the reservoir for lighting and heating purposes until the entire process of recycling had been completed and the gas content of the entire reservoir was practically dry gas. Corzelius was the owner of two distributing corporations that sold gas for lighting and heating purposes to the city of Houston and some war industries located in and near that city. As stated, he completed his well and began production therefrom in January, 1942. Meanwhile he had constructed a pipe line from his well to Houston (operated by a corporation which he owned), through which gas was piped which he sold to his two distributing corporations. This was the only outlet to market for any gas from the field, and this market amounted to between four and five MMCF per day, on the average. Through a process simple and inexpensive in comparison to that employed in recycling (which required very expensive machinery), he extracted a portion of the liquids from the gas he produced, before delivering it into the pipe line. Through this process he obtained about 15.7 bbls. of distillate per 1 MMCF of gas produced. By April, 1943, this amount had dropped to 6.65 bbls.; the exact figures being: 1942, Jan. 15.7; Feby. 12.64; Mar. 10.41; April 12.87; May 12.65; June 14.26; July 9.06; Aug. 11.05; Sept. 10.46; Oct. 9.05; Nov. 8.56; Dec. 5.72; 1943, Jan. 5.31; Feb. 6.51; Mar. 5.83; April 6.65. While the figures fluctuated from month to month, it is clear that there was a gradual trend downward, amounting in the 16 months to approximately 60% decrease. No reasonable explanation of this decrease is afforded other than that the recycled dry gas had already invaded the Corzelius holdings. In fact, the evidence, fairly interpreted, conclusive-

ly shows that such was the case. The total original volume of recoverable gas in the field was estimated at approximately 71,000 MMCF. Of this amount Harrell had recycled 40,000 MMCF prior to May, 1943 (the trial began May 25, 1943). Harrell's holdings comprised 94.8% of the field containing originally approximately 67,308 MMCF of recoverable gas. On the other side of the picture, Corzelius' holdings comprised 4.1% of the field underlaid originally with approximately 2,911 MMCF of recoverable gas. Up to February, 1943, he had produced approximately 1,500 MMCF.

Harrell applied to the Commission for an order prohibiting withdrawals of gas from the field until the recycling process should be completed, or, in the alternative, prorating the withdrawals from the field. A hearing, after notice, was had on this application on December 23, 1941, and based upon that hearing the original order here in issue was promulgated January 17, 1942. In addition to the provisions already stated, this order found as a fact that limited net withdrawals from the field not to exceed 20 MMCF daily would not produce "appreciable waste," and net withdrawals to that amount were authorized. There were various subsequent hearings upon the subject between that date and the filing of the suit (March 27, 1943), each resulting in a continuance of the original order. Harrell meantime filed in the Supreme Court a motion for permission to file a petition for mandamus to compel the Commission to promulgate a proration order for the field. This motion was overruled July 22, 1942, without written opinion. August 15, 1942, Harrell instituted in a Travis county district court a mandamus proceeding, seeking to compel the Commission to promulgate such order. This proceeding was dismissed for want of jurisdiction, on the ground that only the Supreme Court could issue mandatory orders against the Commission under Art. 1735, R.C.S. (See in this connection American Nat. Bank v. Sheppard, Tex.Civ.App., 175 S.W.2d 626, error refused Want of Merit). Harrell again filed a motion in the Supreme Court for permission to file a petition for mandamus, which was overruled October 14, 1942, accompanied with a per curiam opinion (Harrell v. Thompson, 140 Tex. 1, 165 S.W. 2d 81) holding:

"Since the filing of this petition the Railroad Commission has entered an order on the subject indicated, and the question pre-

sented by the motion is now moot. If the order entered is unsatisfactory, the relator has an adequate remedy by appeal therefrom. Vernon's Texas Civil Statutes, Article 6049c, Section 8."

■ Harrell contended before the Commission, in the Supreme Court, and in his pleadings in this suit, that he was entitled to an order inhibiting any gas withdrawals from the field until completion of the recycling process. This contention was predicated upon the theory that production of wet gas for lighting and heating purposes, without extracting all the liquids which would be extracted in the recycling process, was a wasteful method of production. This theory was not adopted by the Commission or the trial court; and is not involved in the appeal. However, the waste theory is urged by Harrell in connection with his contention for a proration order. The record shows that any lowering of the pressure in the reservoir would result in some precipitation into the gas sands of the liquids originally in the gas, and this precipitation would increase as the pressure was diminished; which lowering of pressure would follow the net withdrawal of volume of gas from the reservoir. From the beginning of production to January 1, 1942, there had been a reduction of 118 pounds per square inch in pressure, and a consequent loss of liquid content by precipitation. This was prior to any production by Corzelius; the stated result being produced entirely by the Harrell operations. During the period January 1, 1942—February 1, 1943, there was a further pressure drop of 109 pounds per square inch. It is not necessary to give the detailed figures of the loss by precipitation caused by these reductions in pressure. They merely demonstrate that there is a loss by precipitation of liquids in the reservoir sands under any reduction in pressure, regardless of the method of production. The difference in loss of liquid content as between the two methods of production employed in the field lay wholly in the difference in amount of liquids extracted by the two methods employed. There was the same loss in reservoir precipitation through pressure reduction from net volume withdrawal under either method. It may be conceded that the greater extraction of liquids through the Harrell method, constituted that method less wasteful than the Corzelius method. But both methods were authorized and neither was required. The

use to which the Corzelius production was put was a legitimate one, and was authorized as a non-wasteful use of gas. Harrell certainly had no interest in the percentage of liquids which Corzelius extracted from whatever amount of gas he had the legitimate right to withdraw from the field. The issue of waste due to method of extraction of liquids after the gas was taken from the reservoir was one in which the Commission alone, as representative of the public, had an interest. Suppose (hypothetically) Corzelius had obtained the same kind of machinery employed by Harrell in extraction of liquids, but instead of reinjecting the residue dry gas into the reservoir, had piped it to his market. There would have been no possible change in effect upon the rights or interests of Harrell. The use to which the Corzelius production was put being one authorized, and recognized as non-wasteful, Harrell's only interest lay in the amount Corzelius was permitted to produce.

The merits of the controversy involved in the appeal concern the proper construction and validity of Sections 10 and 11 of Art. 6008, R.C.S., as amended by H.B. 266, 44th Leg., p. 318, 1935, Vernon's Ann. Civ.St. art. 6008 as applied to the instant fact situation. Art. 6008 deals generally with the subject of waste and waste prevention in the production of natural gas. The subject is treated quite elaborately and in some respects in much detail. It is not necessary to set forth the several provisions here other than Sections 10 and 11, which read:

"Commission to prorate and regulate daily production

"Sec. 10. It shall be the duty of the Commission to prorate and regulate the daily gas well production from each common reservoir in the manner and method herein set forth. The Commission shall prorate and regulate such production for the protection of public and private interests:

"(a) In the prevention of waste as 'waste' is defined herein;

"(b) In the adjustment of correlative rights and opportunities of each owner of gas in a common reservoir to produce and use or sell such gas as permitted in this Article."

"Commission to exercise authority, when

"Sec. 11. The Commission shall exercise the authority to accomplish the pur-

pose designated under item (a) of Section 10 when the presence or imminence of waste is supported by a finding based upon the evidence introduced at a hearing to be held as herein provided.

"The Commission shall exercise the authority to accomplish the purpose designated under item (b) of Section 10 when evidence introduced at a hearing to be held as herein provided will support a finding made by the Commission that the aggregate lawful volume of the open flow or daily potential capacity to produce of all gas wells located in a common reservoir, is in excess of the daily reasonable market demand for gas from gas wells that may be produced from such common reservoir, to be utilized as permitted in this Article."

As already stated the issue of waste is not here involved; but only the issue of "adjustment of correlative rights" of the several producers in the field.

It is the contention of Harrell that, independently of any issue of waste, it was the duty of the Commission to prorate ratably among the several producing wells in the field, the daily market demand for gas from the field.

The contentions of Corzelius, on the other hand, are, substantially stated, these:

1. The provisions of Secs. 10 and 11 have no application to the Bammel Field where there are two classes of producers, one of whom (Corzelius) has a market and the only market for gas takers for lighting and heating purposes, and the other (Harrell) is producing only distillates through the recycling process.

2. Secs. 10 and 11, properly construed, authorize and require proration to adjust correlative rights only as an incident to waste prevention; and where, as here, waste is not involved, there is no authority to adjust correlative rights.

3. If these sections, properly construed, authorize adjustment of correlative rights, in the absence of waste, they are, to that extent, invalid in that they constitute a taking of private property without due process of law.

The Corzelius contention that these sections authorize and require proration to adjust correlative rights only where waste is involved, is predicated upon a holding in an opinion by U. S. Circuit Judge Hutcheson in a three-judge decision of a federal District Court. Consolidated Gas Utilities Corp. v. Thompson, D.C., 14 F.Supp. 318.

This particular holding was not essential to the decision and was rejected by the Federal Supreme Court. Thompson v. Consol. Gas Utilities Corp., 300 U.S. 55, 57 S.Ct. 364, 376, 81 L.Ed. 510. The District Court judgment was upheld upon the holding that there was no drainage involved and no correlative rights requiring adjustment. That case involved the validity of an order of the Commission based upon market demand in the Panhandle gas field. The plaintiffs were owners of certain wells in the field and had constructed a pipe line to market gas in another state. There was no other market outlet for the gas from the field. The defendants had already created low pressure areas in their holdings, which were causing drainage from plaintiffs' holdings. The effect of the order was to compel plaintiffs to share their market with defendants, although in doing so they would further accelerate the already existing drainage away from their holdings to those of defendants. Manifestly the order protected no rights of defendants, but impaired the rights of plaintiffs. The court said:

"Our law reports present no more glaring instance of the taking of one man's property and giving it to another."

The holding of the Supreme Court was that "if the act were construed as the defendants contend it should be *and as the commission has applied it*, it would violate the Federal Constitution." (Emphasis added.)

With reference to the lower court's holding that the Act authorized protection of correlative rights, only as an incident of waste, the court said that (absent a construction by the State courts) it was "under duty to make an independent study of the question," and had done so. "That study leaves us in grave doubt whether the lower court has correctly interpreted the intention of the lawmakers."

It is interesting to note that in a later three-judge decision (Judge Hutcheson again writing) the following statement of the court's prior holding is given: "* * * the statute there construed provided only for the protection of correlative rights. It fixed no standard to go by, either in the ascertainment or the protection of those rights, but apparently left both to the unrestricted judgment of the Commission. We held there that such a broad and uncontrolled delegation was invalid, and that the order illustrated the invalidity of the delegation by its result in compelling some

producers to shut down, not because they were draining the properties of others, but merely because other producers had no market for their gas." Henderson v. Terrell, D.C., 24 F.Supp. 147, 153.

■ It is not contended here that the Act is invalid upon the ground stated in this quotation. Nor could such contention, if made, be sustained. "To adjust correlative rights" affords as definite a criterion as that in the exception to Rule 37 "to prevent confiscation of property" (originally "to protect vested rights"). That exception has been uniformly upheld, expressly against this particular attack. See Trapp v. Atlantic, Tex.Civ.App., 169 S.W.2d 797, 800, error refused.

■ We have no serious difficulty in reaching the conclusion that subdivisions (a) and (b) of Sec. 10 are coordinate, and that neither is dependent upon the other, although they may be co-existent. The wording and grammatical construction of both Secs. 10 and 11 clearly call for this interpretation. The Federal Supreme Court's independent investigation left that court "in grave doubt whether the lower court has correctly interpreted the intention of the lawmakers." That court predicated its decision upon the assumption that the defendants had properly construed the Act "as authorizing the Commission to reduce the production of the plaintiffs and of other pipe line owners, even if the sole purpose of doing so is to furnish a market for the sweet gas of those wells now without pipe line connections." Manifestly, this construction, which was essentially implicit in the Commission's order, there under review, would render the Act as well as the order invalid.

Earlier in the opinion the Supreme Court said:

"It may be assumed that House Bill 266 should be construed as authorizing regulations to prevent waste, and to create and protect correlative rights of owners in a common reservoir of gas to their justly proportionate shares thereof, free of drainage to neighboring lands. It may be assumed, also, that the statute, so construed, is a valid exercise of the State's *undoubted power to legislate to those ends.*" (Emphasis added.)

We do not have here the abstract question of the power of the State to curtail production, where the sole curtailment is to protect correlative rights. That ques-

tion is very ably briefed by both parties. The leading case supporting that power is Ohio Oil Co. v. Indiana, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729.

■ The common law unlimited right of capture of natural gas has been curtailed in several respects by statute. One of the chief among these is the prohibition of production for certain uses declared to be wasteful. This prohibition applies to all producers alike in a given field and is necessarily therefore a restriction upon the unlimited right of capture. A decision upholding an order, based upon protection of correlative rights independently of waste, prorating the daily market demand which was less than the total daily allowable withdrawals from the field, is the above case of Henderson v. Terrell. That case arose under Sec. 2 of S.B. 407, Acts 45th Leg., 1937, p. 746, Vernon's Ann.Civ.St., Art. 6008a, § 2, which limited to 750 MMCF the daily allowable of sour gas for carbon black manufacture in fields producing both sour and sweet gas, and provided that where the daily demand for such gas for such use is less than such daily maximum allowable such demand shall be prorated among all the wells in such area producing sour gas for such purpose. The total demand for sour gas for carbon black from the field was 690 MMCF daily, and the order prorated that amount among the several applicable wells, the effect of which was to reduce the production of plaintiffs below their market and require them, in order to fill their contracts, to purchase from others having no market. The controlling distinction between that case and the Consolidated case lies in the fact that in the former there was excess drainage, whereas in the latter there was none, as already pointed out. The fact that the order in the Henderson case dealt with production of sour gas for carbon black manufacture distinguished it in no material respect from that in the Consolidated case. The statute having authorized production of sour gas for that purpose to the extent of not exceeding 750 MMCF daily, production to that amount was open to all producers in the field alike, and the otherwise unlimited right of capture was curtailed beyond the daily maximum thus allowed.

The contention there, as here, was that since the production (market demand) was below the maximum allowed "the Legislature may not authorize the Commission to, the Commission may not, prorate it."

Answering this contention the court said:

"We think this view overlooks the nature and source of the power to prorate the production from wells whose output is lawfully limited. These are to be found in the fact that whenever the Legislature imposes lawful restrictions upon the quantity of oil or gas that may be produced, so that thereafter owners may not any longer, under the common-law rule of capture, fully fend for themselves, the duty rests upon the Legislature to make provision for the proration and distribution of the allowed amount among the wells in the field, so that no one of those thus limited may take undue advantage of any other.

"The source and nature of the power then being found in the fact that as a corollary to its lawfully imposing limitations upon the oil and gas an owner may produce from his wells, the state must make provision for justly apportioning the amount thus limited among those entitled to take it, it follows that where there is a limit set on production the obligation as clearly rests upon the state when the limit of production as here, is about to be, as when it is, fully reached."

Further, the opinion reads:

"We think the statute is simply and clearly phrased to give effect to a public policy, and to exercise the police power in respect to matters which the courts of Texas and of the United States uniformly hold it is the right of the state by statute, to control. This right extends to preventing one person from unduly draining from under the lands of another, oil and gas lying in a common pool equally when the undue drainage is for wasteful uses, and when the rule of capture no longer applying, because of lawful statutory limitation, one of the owners, by drawing more than his due proportion of the limited share, is draining the lands of his co-owners.

"We find nothing unreasonable in the statute, nothing unreasonable in the orders. For all that the statute does, all that the orders do, is to make limitation and proration effective by putting an end to an existing unreasonable drainage condition, and preventing its continuance in the future. Neither the statute nor the order operates retrospectively, either punitively or reparatively; both operate prospectively. So operating, they merely say to plaintiffs 'you may produce from your wells of the total amount limited in a due proportion with every other well in the field. You may not produce more.' "

The decision in that case rests, in our opinion, upon sound and well-established legal doctrine which controls the issues in the instant case.

The record shows that Corzelius is producing by volume in excess of his fair share of the total net volume allowable from the field, and to that extent is creating a local net drainage, by volume, from Harrell's holdings. Harrell, on the other hand, though withdrawing by net volume only 2 MMCF daily, is processing 35 MMCF, extracting therefrom the valuable liquids, and is already reducing (draining) the liquid content of the gas from. Corzelius's holdings. Corzelius is entitled to produce his fair share of the recoverable liquids, as well as his fair share of the volume of recoverable gas. Thus each is draining from the other's holdings, though of different elements of the total gas content.

■ It would be manifestly unjust to prorate from the viewpoint alone of the net volume of gas daily produced from the field. On the other hand, it would be manifestly unjust to permit Corzelius to produce more than his fair share of the recoverable gas, measured both by volume and liquid content. Art. 6008, Sec. 13, requires the Commission, in prorating the daily allowable from each well, to take into consideration, in addition to certain stated factors, "all other factors which are pertinent." We think it fairly deducible from the record that the Commission has the means of ascertaining what would be a proper proration order, reasonably fair alike to Corzelius and Harrell; although the evidence from that viewpoint was not sufficiently developed to reach a definite conclusion as to the proper proportions of withdrawal to effectuate that objective. We conclude therefore that the duty rests upon the Commission to make such proration order after due notice and hearing.

Under this conclusion we overrule Corzelius' point 1 above. His other two points have already been disposed of.

■ We should add in this connection (paraphrasing from the Trem-Carr case— Railroad Comm. v. Shell Oil Co., 139 Tex. 66, 161 S.W.2d 1022) that the Commission would not have to be absolutely accurate in its determination of what the relative

proportions of withdrawal should be, provided the order has a reasonable basis in fact. The same thought is thus expressed in the Henderson case: "In a situation of this kind, no absolute perfection may be looked for; a reasonable approximation is the best that may be attained to." We also direct attention to Sec. 12 of Art. 6008, which provides for monthly hearings by the Commission, thus imposing the continuing duty of observation, thereby affording like opportunity for correction of any inequities that actual experience under proration orders may reveal.

Corzelius presents the further point that Harrell is not an "interested person affected by" the order within the meaning of Sec. 8 of Art. 6049c, Vernon's Ann.Civ.St. This point is predicated upon the following assertion:

"Appellee had no right to file a suit attacking the order here involved because appellee's injury (he has sustained no injury, but we are assuming here for the sake of argument that he has) *resulted from the Commission's failure to enter an entirely different order from that which it did enter.* Appellee's position is worse with the order in question invalidated than it is with the order in force. Under the order appellant can withdraw not more than 20 million cubic feet of gas per day for light and fuel purposes; but with no order in effect, appellant can withdraw any amount of gas that he desires.

"What appellee really wanted, as is shown by the main prayer in his petition, was a mandatory injunction requiring the Commission to enter the kind of order desired by him."

█ Harrell's right to a mandatory injunction is not here involved. This court has held that the Commission comes within the purview of Art. 1735, and that only the Supreme Court can issue a mandatory writ against it. Railroad Comm. of Texas v. Gladewater Ref. Co., Tex.Civ.App., 179 S.W.2d 320. See also State Banking Board v. Winters State Bank, Tex.Civ. App., 13 S.W.2d 391, error refused, citing Middlekauff v. State Banking Board, 111 Tex. 561, 242 S.W. 442; but see Betts v. Johnson, 96 Tex. 360, 73 S.W. 4. The trial court so held in dismissing the prior mandamus suit; and its judgment was not appealed from. The same holding is probably implicit in the Supreme Court's order overruling Harrell's motion for leave to file a petition for mandamus.

█ But (the question of jurisdiction of a mandatory action against the Commission aside) it is clear that an essential prerequisite to invoking such jurisdiction is to exhaust the remedy by application to the Commission and by appeal from any order it may make thereon, whether the effect thereof be either tantamount to a refusal to act or otherwise unsatisfactory to the applicant. It cannot be gainsaid that Harrell had a vital interest in having a proper proration order made. Consequently, the appropriate procedure to obtain such order was that resorted to—to apply to the Commission and in case of unsatisfactory action by that body to appeal therefrom under the express authorization of Art. 6049c, § 8. The Commission's order was presumptively valid, could not be attacked collaterally, and until set aside by direct appeal constituted an insuperable barrier to any character of relief, whether mandatory or restrictive. The gist of Harrell's cause of action was the obtaining of a judicial determination of the validity of the order. Any further relief, mandatory or restrictive, would be but ancillary to a judgment invalidating the order, upon which it was of necessity dependent. An adjudication invalidating the order without further relief, was not a mere declaratory judgment, as Corzelius contends, but was an authoritative adjudication of Harrell's rights removing the bar to their acquisition. It was not essential that he ask for further relief in that proceeding; and assuming the exclusive jurisdiction of the Supreme Court in that regard, it was not available to him therein. The right under Art. 6049c, § 8, to appeal from an order of the Commission refusing an application for an order has been uniformly upheld. See Wencker v. Railroad Comm., Tex.Civ.App., 149 S.W.2d 1009, error refused Want of Merit; Railroad Comm. v. Magnolia Pet. Co., Tex.Civ.App., 169 S.W.2d 253. That injunctive relief is merely an enforcement remedy ancillary to a judgment cancelling an order of the Commission was expressly held in Allen v. Gulf Oil Corp., Tex.Civ. App., 139 S.W.2d 207, error refused. Mandatory relief manifestly falls in the same category. It is not to be presumed that the Commission would further refuse to act after a final judgment decreeing invalid its former order of refusal. But should there be such further refusal the right to mandatory relief would become available. It should be noted, however, that such mandatory relief does not extend to decreeing

the terms of such order, where, as here, they involve matters within the discretion of the Commission, and this regardless of the court's jurisdiction otherwise. The Commission may, however, be required to act without direction within the field of its discretion. As stated in the recent decision in Marrs v. Railroad Comm., Tex.Sup., 177 S.W.2d 941, 950:

"A court has the right to review the action of the Railroad Commission, and to strike its orders down if they are illegal; but it has no authority to write a proration order for the Commission, nor to prescribe the terms of a subsequent order to be entered by the Commission."

That Harrell had the right of appeal from the order was expressly held by the Supreme Court in the above quotation from its per curiam opinion in Harrell v. Thompson, 140 Tex. 1, 165 S.W.2d 81.

The trial court's judgment is affirmed.

Affirmed.