**STANDARD OIL CO. OF TEXAS v. RAIL-
ROAD COMMISSION OF TEXAS et al.**

No. 9720.

Court of Civil Appeals of Texas. Austin.
Nov. 17, 1948.

As Corrected on Denial of Rehearing
Dec. 8, 1948.

Maurice Cheek, of Ft. Worth, Looney & Clark and Everett Looney, all of Austin, Burges, Scott, Rasberry & Hulse, and Louis A. Scott, all of El Paso, Thompson, Knight, Harris, Wright & Weisberg, Dwight L. Simmons, and H. F. Thompson, all of Dallas, for appellant.

Price Daniel, Atty. Gen., of Tex., Fagan Dickson and Elton M. Hyder, Jr., Asst. Atty. Gen., for Railroad Com'n. of Tex.

Wilson & Wilson, of San Angelo, for Yates et al.

Cantey, Hanger, McKnight & Johnson, Gillis A. Johnson, and Warren Scarborough, all of Fort Worth, and Ed Roy Simmons of Corsicana, for Midland Petroleum Corporation & M. D. Bryant.

Joseph Cocke and Edwin Yeiser, both of Austin, for Iraan Producers, Inc.

Black & Stayton, Charles L. Black, Graves & Dougherty, Ireland Graves and Hart, Brown & Sparks, all of Austin, and Clayton L. Orn and John L. Camp, both of Houston, for Ohio Oil Co.

McCLENDON, Chief Justice.

Suit by Standard[1] (Standard Oil Company of Texas) against the Commission (Railroad Commission of Texas) brought under Art. 6049c, Sec. 8, Vernon's Ann.Civ. St., to set aside orders of the Commission prorating the allowable in the Yates Oil Field in Pecos County. Operators in the field other than Standard and a number of royalty owners intervened as parties defendant, seeking to uphold the orders. The trial was to a jury, but, under circumstances noted below, the jury was discharged and judgment rendered declaring and decreeing the orders valid.

The appeal is by Standard and presents two main issues, whether:

1. The trial court committed error in not dismissing the entire suit without prejudice, upon Standard's motion for non-suit; and,

2. The validity (non-discriminatory effect) of the orders was supported by substantial evidence.

To facilitate a clear understanding of these issues, we give the following historical outline of the orders, and the proceedings before the Commission and the trial court wherein Standard sought their modification and annulment. The discovery well in the Field was completed October 30, 1926, after which and prior to July 1, 1928, some 200 producing wells were brought in. Meantime the operators in the Field employed an expert to prepare rules to prorate the Field agreeing to be bound by them, and requested the Commission to adopt them, which it did July 1, 1928. These rules provided for their administration by the Commission through an Advisory Committee selected by a General Committee composed of one representative of each operator, and an umpire appointed by the Commission from nominees proposed by the Advisory Committee. The details of this administration are not important here. The Legislature enacted comprehensive conservation laws in 1932, and thereafter (March 31, 1932) the Commission readopted its former rules; discontinuing, however, the Advisory Committee. These rules continued in force until amended January 21, 1937. Prior thereto they provided generally for a Field division into 100 acre proration units, and for division of the total Field daily allowable (65,000 bbls.) into two portions of $\frac{1}{4}$ and $\frac{3}{4}$. The $\frac{1}{4}$ was divided equally among the Field units regardless of whether they contained as much as 100 acres. The $\frac{3}{4}$ was allocated among the separate units in the ratio that their average daily potentials (the sum of potentials of all wells in the unit divided by the number of wells therein) respectively bore to the total daily potential of all wells in the Field. Units of more than 100 and less than 200 acres were given an additional allowable proportionate to acreage in excess of 100. Operators could drill as many wells as they chose within the spacing rules, originally 2 acres, later 10 acres. Under the January 21, 1937, amendment the division of the allowable into two portions was abolished, and the entire allowable was divided among the units in proportion to their average daily potentials as follows: units of 50 or more acres were classified as full units; those of less than 50 acres were divided (according to acreage) into two classes, those with the larger acreage being classified as $\frac{1}{2}$ units and those with the smaller as $\frac{3}{8}$ units. Other details of the rules will be noted later, where deemed necessary. September 24, 1945, Standard filed application with the Commission for modifications of the rules, which was set for hearing October 23, 1945, and appropriate notice issued to interested

---

[1] Note. Standard is successor in title of California Company, whose participation in proration orders is concededly properly ascribed to Standard, and will not be separately stated herein.

parties. The requested modifications were in quite general terms, and on October 10, 1945, upon request of a number of interested parties, Standard was ordered to supplement its application by supplying data regarding its desired modifications in various particulars specifically inquired about. Standard complied with this order. There were hearings before the Commission on Standard's application, but no action taken until September 18, 1947. Meantime Commissioner Jester (who became Governor in January 1947) and his successor Commissioner Murray, recused themselves, the latter because of employment by Standard prior to his assuming office January 1, 1947. Standard filed this suit in the spring of 1947, alleging that the Commission had failed and refused to consider its application. The order of September 18, 1947, denied Standard's application, but its validity was challenged by Standard in a supplemental petition, on the ground that it was concurred in by only one Commissioner, Chairman Thompson, Commissioner Murray recusing himself, and Commissioner Culbertson concurring in denying the application only in so far as it sought allocation based on 100% of reserves and oil in place, but dissenting from denial of abolition of average unit potential, in lieu of which, he stated, "I am willing to go as high in allowing an allocation formula to be based on 100% potential as long as it does away with the average unit potential."

The trial began October 6 (all dates in 1947), and proceeded daily until October 28, during which time Standard introduced oral and documentary evidence, the transcript of which embraces five volumes aggregating 1971 typed pages, besides a large number of maps and charts which accompany the record. On the latter date, and before it rested, the court, at Standard's request, recessed until 2 p. m. October 29. At 10:05 a. m. October 29, defendant-intervenors, upon leave granted (without notice to Standard) filed a trial amendment asking an affirmative declaratory judgment confirming the orders. At 2 p. m. October 29, before Standard had rested, it presented a written motion requesting a non-suit and asking that the case be dismissed in its entirety. The non-suit was granted, but without prejudice to the rights of parties defendant to relief sought under their pleadings. Standard was then granted additional time for further announcement, and at 4 p. m. October 30 renewed its motion for non-suit and dismissal of the case in its entirety. This was denied. Standard then asked that it be permitted to withdraw its announcement of ready, and that the jury be dismissed and time be given for it to answer and prepare for trial on the answers of the several defendants seeking affirmative relief. The court then asked Standard's counsel twice how much time was desired for that purpose, but counsel "failed and declined to answer the court, or state how much time was desired," whereupon the request for further time was denied. The jury was then called in and the court announced it was bound to consider the testimony already introduced, and defendants reoffered such testimony. To this Standard objected on the ground that it was denied the privilege of cross-examination, "but" (the judgment recites) "it appearing to the court that such witnesses were all witnesses which had been previously called to the stand and vouched for by plaintiff, and further that such witnesses were then present in the courtroom, the court called on Standard * * * to proceed with the trial, but it in open court declined either to rest or go forward in the case." The Commission then moved for a directed verdict; in lieu of granting which the court discharged the jury and rendered judgment decreeing the orders in question valid. We have stated these details in order to give an accurate picture of what transpired at the trial.

In the main Standard's contentions regarding the court's refusal to dismiss the entire case without prejudice may thus be epitomized:

1. When its motion for non-suit was filed no pleading of any defendant sought affirmative relief. Hence it was entitled, as a matter of law, under Rule 164, Texas Rules of Civil Procedure, to dismissal of the entire suit without prejudice.

2. Only those "dissatisfied" with a Commission order may bring suit under Art. 6049c, Sec. 8. No defendant could have brought suit to validate the order since

none was "dissatisfied therewith." Consequently, no defendant could maintain or prosecute the suit upon affirmative pleadings or otherwise, after Standard had taken a non-suit.

3. Proration orders being subject to change at any time by the Commission, suit to establish their validity can not be brought or maintained by the Commission under the Uniform Declaratory Judgment Act, Art. 2524—1, V.A.C.S., or otherwise.

4. Appellees' pleadings are deficient in the following essentials to affirmative or declaratory relief:

a. Only negative relief is sought.

b. The sought relief is not clearly alleged.

c. Independent suit could not be maintained by any appellee (same as 2 above).

d. No cause of action is stated.

■ We have concluded that Rule 164 does not arbitrarily control the action of the trial court in a suit under Art. 6049c, Sec. 8. Therefore the court would have been warranted in dismissing the entire suit with prejudice upon Standard's refusal to proceed with the trial. And this, regardless of whether there were any pleading by any defendant seeking affirmative relief. What the court actually did was tantamount to dismissal with prejudice, so far as concerns Standard; and it therefore is not prejudiced by the further action of the court in deciding the merits of the case upon the record it had made. The following considerations impel this conclusion.

■ The suit authorized by Art. 6049c, Sec. 8, is a special proceeding created for the purpose of enforcing "a right which exists only by operation of statute". Alpha Petroleum Co. v. Terrell, 122 Tex. 257, 59 S.W.2d 364, 367 and 372. Hence the rules governing civil actions generally apply only in so far as they are not in derogation of the purposes and objectives of the statute. A somewhat analogous case is that of a condemnation suit, wherein it is held that Rule 164, in so far as it prohibits taking a non-suit by plaintiff after "the jury has retired," is not applicable, and non-suit is permitted as a matter of right even after verdict, although the governing statute,

Art. 3266, Sec. 6, V.A.C.S., provides that "the cause shall be tried and determined as in other civil causes". See Board of Regents v. Kelley, Tex.Civ.App., 208 S.W. 2d 565, following Leonard v. Small, Tex. Civ.App., 28 S.W.2d 826, error ref. It should be noted that Sec. 6 of Ch. 313, p. 694, Acts of 1929, which authorized this character of suit, and was later superseded by Art. 6049c, Sec. 8, contained the provision that "said action * * * shall be tried and determined as other Civil cases in said Court." No such provision is contained in Art. 6049c, Sec. 8, a fact adverted to as significant in Trapp v. Shell Oil Co., 145 Tex. 323, at page 342, 198 S.W.2d 424. We do not, however, regard this omission as controlling here. See Consolidated Chemical Industries v. Railroad Comm., Tex.Civ.App., 201 S.W.2d 124, error ref. N.R.E. Art. 6049c, Sec. 8, provides that the suit is "to test the validity" of the Commission orders, etc. Also that:

"Such suit shall be advanced for trial and be determined as expeditiously as possible and no postponement thereof or continuance shall be granted except for reasons deemed imperative by the Court."

The corresponding provision of Sec. 6 of the 1929 Act regarding the purpose of the suit merely provided that the petition of the "dissatisfied party" should set forth "the particular cause of objections" to the order. The purpose of the suit was not otherwise stated.

The above quotation from Art. 6049c, Sec. 8, precludes the thought of an arbitrary right of non-suit with all its general implications and attributes. It may be conceded that upon proper showing of good cause, the trial court would have the discretionary power of granting such non-suit. That is not the case here. So far as the record shows, and from every reasonable inference to be drawn therefrom, the case had been fully developed at the time motion for non-suit was filed. Standard was given every opportunity to make a showing of reasonable basis for postponement. It sat mute; and rested upon its alleged arbitrary legal right under Rule 164 for dismissal without prejudice. Through its predecessor in title it had been a large operator in the Field, almost from its inception. It

had all the expert and factual knowledge regarding the Field, the proration orders and their operation, that the Commission or anyone else had, so far as the record discloses. It had participated in and been a party to the promulgation and administration of those orders from the beginning. The orders were of vital importance to the other operators and royalty owners in the Field, and to the State as representative of its people generally, in the conservation of one of its most important natural resources. The express mandate of Art. 6049c, Sec. 8, for advancement and all possible expedition in determining the suit, and its express inhibition from granting any postponement or continuance thereof "except for reasons deemed imperative by the Court", impels approval of the court's action in question.

■ The other above points regarding Standard's asserted right to dismiss without prejudice, are ably and elaborately (we might say exhaustively) treated in the briefs of the respective parties. Our above holding renders these points nonessential. However, we deem it not amiss to state our views thereon as briefly as with clarity we may. At the time motion for non-suit was filed the pleadings of defendants (other than the trial amendment) consisted of the following: The Commission's amended answer was filed June 7. Following a general denial it sets up what is headed "Affirmative Defense" covering 6 typed pages, in which it adopts pleas in intervention of the Ohio Co. (27 pages filed May 2) and Midland Co. (43 pages filed June 7), and concludes with a prayer asking that its orders "be in all things sustained." These answers of Ohio and Midland prayed only that Standard take nothing. Also, on June 7, Iran Co. filed its plea in intervention expressly praying "that judgment be entered approving the proration rules" in issue. Amended petitions in intervention were filed by White Eagle Co., Aug. 14; by Yates interests, Aug. 14; by Ohio Aug. 26; and by Midland Sept. 9. The Yates were royalty interests, the others were producers. The prayer in each of these interventions was for take nothing judgment only. The trial amendment was filed only by the Yates interests, and it added only a prayer for judgment declaring the orders valid. We attach no importance to this amendment. We have carefully examined all these pleadings. The amended answer of the Commission and pleas of Ohio and Midland which it adopted very fully set forth the grounds upon which Standard's suit should be denied and upon which the orders should be upheld. These pleadings, alone were sufficient to support a prayer for affirmative relief, and clearly the Commission's amended answer expressly prayed for such relief. The amended pleadings of White Eagle, Yates, Ohio and Midland embraced some 70 pages. They merely set forth with more particularity and elaboration the same defenses to Standard's suit and grounds for upholding the orders as the pleadings they amended. True, they did not have a prayer for affirmative relief. But they were pleadings in the record on which the case had been tried up to the filing of the non-suit motion.

■ So far as concerns the pleadings, they were sufficient in every way to support the court's judgment, if the suit be one in which the Commission is entitled to such affirmative judgment. We think it is such suit, even if it be conceded that the Commission could not originally have brought suit under Art. 6049c, Sec. 8, or could not have maintained an independent suit under the Uniform Declaratory Judgment Act.

The essence of the action created by Art. 6049c, Sec. 8, is "to test the validity" of the orders complained of. Such has been the uniform holding of the Supreme Court and this court in the many cases brought under Sec. 8. It does not provide in terms for any consequential relief. All such relief is but ancillary. See Corzelius v. Harrell, Tex.Civ.App., 179 S.W.2d 419, and cases there cited. The action is therefore in essence one for a declaratory judgment. And where plaintiff brings a maintainable suit for declaratory judgment it would seem to follow by every rule of reason and logic that the defendant would be entitled to an adjudication *in that suit* of the controversy presented by the plaintiff. That a controversy (and a most vigorous one) exists is conclusively shown by the filing of the suit, the pleadings in the case, and the appeal to this court, in which Standard

is still seeking to have the orders declared void. The statute makes such controversy a justiciable one.

Our further discussion of procedural issues relates only to Standard's contention that affirmative relief is not available (1) to the Commission because its "power to regulate oil production in the interest both of conservation and of protecting correlative rights is a continuing one, and its proration orders are subject to change, modification or amendment at any time, upon due notice and hearing, either upon the Commission's own motion or upon application of an interested party"; or (2) to any other defendant because no one has a "vested right to the continuance of the formula," —holdings in the Hawkins Field Proration Case (Railroad Comm. v. Humble Oil & Refining Co., Tex.Civ.App., 193 S.W.2d 824, error ref. N.R.E., affirmed Williams v. Railroad Comm., 331 U.S. 791, 67 S.Ct. 1523, 91 L.Ed. 1820). The principle announced in the first quotation from the Hawkins case is well established. Proration orders have for their objective prevention of waste, and at the same time protection of correlative rights of property owners in the field. They represent the deliberate judgment of the Commission as meeting those objectives, based upon existing knowledge of underground conditions and of the effect of the formula adopted upon those conditions present and prospective. Manifestly these underground conditions are constantly changing in a field under active operation, from a variety of causes. Some of these changes may be the result of operation of the proration formula not originally anticipated or forseeable. They nevertheless constitute "changed conditions" within the rules applicable thereto. The Commission, through its experts, field representatives, and reports of operators, keeps constantly informed regarding the operation of its proration formulae. This is true also of the operators in the field, especially the larger ones, through their engineers and other experts. The Commission no doubt, either upon its own motion or that of an operator, would change a for-

mula whenever revealed changed conditions showed it was not meeting its above objectives. Such change in formula would be subject to the same right of review under Art. 6049c, Sec. 8, as any other order of the Commission. Certainly the Commission would not change a proration formula except for what it regarded as valid substantial reasons. It is of vast importance to the industry, as well as to property owners in the field and the Commission as the representative of the public generally, that proration formulae be as stable as reasonably possible, consistent with the stated objectives. It may be noted that the general Yates Field formula remained in effect without modification (except as to minor adjustment not important here) for nearly 9 years (July 1, '28-Jan. 21, '37), and the formula adopted on the latter date for a like period (Jan. 21, '37-Sept. 24, '46) before it was ever challenged. From the very nature of a proration formula, and the magnitude of the interests therein, both public and private, it ineluctably follows that the Commission has the affirmative right, when challenged in an appropriate judicial proceeding, to have its validity established, and the continuing uncertainty removed, which would result from the untrammeled right of the challenging party, from whatever cause, to bring its validity (except for changed conditions) again in issue. The case here presented is not distinguishable in principle from the Konowa case (Railroad Comm. v. Konowa Operating Co., Tex.Civ.App., 174 S.W.2d 605). Importance to the public alone would seem to warrant a judicial determination of the validity of the orders. See Abilene & S. R. Co. v. Terrell, Tex.Civ.App., 131 S.W. 2d 37 (Error Ref.), and authorities there cited.

 Upon the merits of the case: The controlling question is whether under "the record * * * as a whole" the orders are "reasonably supported by substantial evidence". Trapp v. Shell Oil Co., 145 Tex. 323, 198 S.W.2d 424, 441; Hawkins v. Texas Co., 146 Tex. 511, 209 S.W.2d 338.[2]

---

[2] Note: The substantial evidence rule is thus stated in the Trapp case; approved in the Hawkins v. Texas Co. case:

"This does not mean that a mere scintilla of evidence will suffice, nor does it mean that the court is bound to select

Appellees, in their original brief, have set out in much detail the factual situation presented by the record. It covers approximately 78 pages of the brief (152-230) and is arranged under the following headings and subheadings:

I. Physical Characteristics Of The Field: 1. *Size of Field* (152-3); 2. *Stratigraphy* (153-4); 3. *Size of wells varies* (154-7); 4. *Volume of reservoir porous space unknown* (157-9); 5. *Measure of reservoir permeability unknown, but varies* (159-60); 6. *Thickness of producing formation unknown, but varies* (160-1); 7. *Recoverable oil in place unknown* (161); 8. *Water drive transmits pressure across field from east and northeast* (161-2); 9. *Gas cap expansion forces oil down and out* (162-3); 10. *Bottom-hole pressure in large area substantially uniform* (163-4).

II. Proration Plan: 1. *Field more than four-fifths developed before Commission assumed full jurisdiction in 1932* (164-6); 2. *Operators devised a proration plan to fit the characteristics of the Field* (166-8); 3. *Proration plan explained* (168-170); 4. *Very few small tracts in the Field* (170-71); 5. *Formula for ascertaining currently well potentials* (171-5); 6. *Formula for ascertaining potentials prevents waste, pressure sinks, and is reasonable* (175-7); 7. *Commission has used bottom-hole pressure plan for approximately 15 years* (177-78); 8. *Modification of proration plan in 1937* (178-180); 9. *Plan does not cause waste* (181); 10. *Difficulties in writing proration plan for an oil field* (181-2); 11. *Aspects of proration plan from the standpoint of small tract owners* (182-196).

III. Appellant Not Injured: 1. *Productivity of wells on all of appellant's leases except two are below field average* (196-204) ('This takes up in detail each of appellant's leases.); 2. *Surface acres do not reflect recoverable reserves* (204-207); 3. *Forty-acre segment with three small tracts in center* (207); 4. *Appellant not suffering substantial injury from allowables as-*

*signed small tracts* (208-210); 5. *No evidence appellant suffering uncompensated drainage* (210-216); 6. *Appellant not injured by use of average unit potentials instead of total well potentials* (216-18); 7. *Appellant not injured by Commission's formula for ascertaining currently well potentials* (218-225); 8. *Special Concession area* (225-7. Thin well area); 9. *Assumed pay volume does not reflect recoverable oil in place* (227-29); 10. *Appellant has not exercised self-help* (229-30).

We have ·checked these pages with the record sufficiently to conclude that they present a fair and accurate statement of the material facts in evidence, and we approve and ádopt them as our own. Manifestly, this detailed factual situation is not of general importance to the jurisprudence of the State, and no other consideration would warrant its inclusion in a published opinion. We give in substance the situation sufficiently to present a fair picture of the controlling factual elements.

The field comprises some 21,231 productive acres with 572 producing wells having a gross 12-hour potential of 3,870,188 bbls. The allowable is 64,881 bbls. per day for a fixed number of days per month. This amounts to a daily average of 50,000 bbls, which is the maximum efficient rate of production for the Field. The oil producing structure is an anticline composed of dolomitic limestone, the axis of which extends from the NW side of the Field SE and then in a wide arc to the S side of the Field. The structure dips and thins out gradually W of the axis and drops off sharply to the E and NE. This structure differs substantially from that in the Hawkins, East Texas and other fields involved in contested proration orders, in that the latter producing structures consist of sands of varying porosity and permeability, whereas the dolomitic limestone is practically impervious and the oil permeates the interstices, the rate of flow depending upon the size of the interstices. The flow is so

---

the testimony on one side, with absolute blindness to that introduced by the other. After all, the court is to render justice in the case. The record is to be considered as a whole, and it is for the court to determine what constitutes substantial evidence. The court is not to substitute its discretion for that committed to the agency by the Legislature, but is to sustain the agency if it is reasonably supported by substantial evidence before the court."

great in portions of the axis ridge that the interstices are referred to as conduits. From the great irregularity of dispersement of the limestone throughout the structure the Field is regarded as "the most regularly irregular" field in America. Due to this irregularity wells of widely varying size (potential) are found very shortly distant from each other. A striking illustration of this wide variation is found in two 40-acre segments of the Field shown on Standard's exhibits 33 and 42. The former embraces three of the seven small tracts in the Field (Midland-Turner, Bryant Turner, each of 1.99 acres, and Bryant Robertson of 2.97 acres) and portions of Standard's Yates Sec. 34 on the NW, Standard's Bob Reid on the N, and Ohio leases on E, S and W. Twelve-hour daily potentials of the wells in this segment (1 each on the three small tracts, 2 on Yates, 3 on Bob Reid and 9 on the Ohio leases; these latter 13 having been drilled as offsets or double offsets to the wells on the small tracts) are as follows (initials are used as follows: M-T for Midland-Turner; B-T for Bryant-Turner; B-R for Bryant-Robertson; O for Ohio; Y for Standard's Yates Sec. 34; and SBR for Standard's Bob Reid):

M-T 72,149; B-T (about 325′ E) 22,284; B-R (127′ S of M-T) 30,694; O-35 (325′ E of B-T) 37,218; 380′ N of which is O-38, 33,923; O-36 (380′ N of O-38) 33,923; SBR-3 (326′ E of O-36 and 382′ N of B-T) 78,915; SBR-2 (330′ E of SBR-1, and 406′ N of M-T) 11,682; SBR-1 (126′ N of SBR-2) 6,158; Y-23 (317′ W of SBR-1) 6,434; Y-24 (125′ S of Y-23 and 309 W of SBR-2) 14,667; O-27 (400′ S of Y-24 and 310′ W of M-T) 13,202; O-23 (128′ S of O-27) 6,000; O-5 (about 225′ S of O-23) 9,332; O-42 (204′ S of O-5) 15,939; O-8 (about 100′ W of O-42) 2,240; O-41 (about 450′ S of B-R and 330′ E of O-42) 6,419. Thus it will be seen that in this 40-acre segment (1320′ square) the potentials of these 16 wells vary from 2,240 to 78,915; with drops: from 15,939 to 2,240 in 100′; from 72,149 to 30,694 in 127′ and to 11,682′ in 406′; and from 78,915 to 11,682 in 330′, to 22,284 in 382′ and to 33,923 in 326′.

The distance between these wells varies from about 100′ to about 400′, an average of 292′. The gross potentials are 367,256, almost 10% of the entire Field; an average of 22,000 per well, as against the Field average of 6,750. The M-T (72,149) and SBR-3 (78,915) are among the largest in the Field which has the largest in this country. Standard admits that it has no complaint of discrimination against its Bob Reid and Yates (Sec. 34) leases. A similar, though somewhat less variant situation, is presented in the 40-acre segment in ex. 42, in which are 11 wells with potentials ranging from 1,877 to 39,922. Standard's closest well to any well in this segment is a little over half a mile. Most of its leases are in "leaner" portions of the Field. The average unit potential rule works to the advantage of the large units (Standard has no small units), as a deterrent to drilling, since the operator would incur the double risk of the cost of drilling and the chance of reducing his average unit potential, as against the hazardous fortuity of raising such potential, dependent upon the size of the added well, as to which there is no assurance. In other words, it is taking a large double risk upon a pure gamble. This is especially true in the "fatter" portions of the Field. For example, if Standard had drilled only its SBR-3 its average unit potential on its Bob Reid lease would have been 78,915; whereas, the potentials of the other two wells reduced this more than one-half to 32,252 (78,915+11,682+6,158=96,755÷3=32,252). Even with this reduction these three wells (0.5% of the Field) have an allowable of about 2.5% of the Field, and have already produced 2,833,225 bbls. Standard pleaded that this lease "received an allowable at a rate in excess of its percentage of fair share of oil."

Also to the advantage of the large units is the classification in the 1937 formula of the small tracts into ½ and ⅜ units. All of the wells on the seven small units were large ranging from 12,820 to 72,149.

Another substantial advantage to Standard in the 1937 formula is a provision for minimum allowable of 10 bbls. per well and 25 bbls. per unit.

The main complaints of Standard regarding operation of the 1937 formula are: (1) Discrimination, in that it does not afford

Standard the opportunity to recover its fair share of the recoverable oil in the Field based upon either (a) recoverable reserves or (b) acreage; and (2) the method of ascertaining the daily well potentials (productivity) is not adequate in that it is not reasonably accurate.

As to (1): Standard has 3,285 productive acres (15.5% of the Field) with 69 wells (12.3% of the Field). The average density is 1 well to 48 acres; that of the Field being 1 to 37. Its daily 12-hour productivity and its allowable are each about 11.5% of the Field. Standard contends that its "pay volume" (recoverable reserves) in what it classifies as the "prorated field" is 17.03%, whereas its allowable in the same area is only 11.44%. The "non-prorated area," which Standard deducts from the balance of the Field is that portion in which the wells are so small that they receive the arbitrary minimum allowable of 10 bbls. per well and 25 bbls. per unit. We do not regard the deduction as having any controlling bearing upon the question at issue; and it may therefore be disregarded with the assumption, arguendo only, that it is a proper one. The method by which Standard arrives at the "pay volume" is substantially that employed in the Hawkins Field —that is estimating the volume of the reservoir, and of the several leases by calculations based upon averages from known factors,—in this instance from height and depth of structure and potentials. The known factors here are even more uncertain than those in the Hawkins Field. The structure there was a sand formation and the irregularities were due to structural faults. The wells had been cored and the porosity and permeability of the sands determined with reasonable accuracy. Even there, however, it was demonstrated that the averages varied widely in the same area when calculated from dense and sparse drilling. Here the data involved are much more uncertain in character. Only a few of the wells had been cored, and potential was the only factor from which to arrive at permeability and porosity. Likewise, the bottom level of the reservoir was not known in the greater portion of the Field due to drilling restrictions. Again, the extreme irregularity of the structure in this Field, with a like uncertainty as to the reservoir volume, as a whole or in any particular portion of the Field, rendered such volume of greatly more uncertainty of ascertainment, through assumed averages, than in the Hawkins Field. Standard's methods of calculating the "pay volume" are therefore not to be given controlling effect, even were reserves, where estimated with substantial accuracy (clearly not the case here) entitled to such effect. For, to quote from the Hawkins Field case [193 S.W.2d 833]:

"It has never been held that recoverable reserves constitute the only factor to be considered in determining the validity of a proration order. And so far as we are aware no proration order has ever been made in which the allowable has been allocated in proportion to the recoverable reserves."

Acreage is a factor only in estimating recoverable reserves.

As to (2): The potentials are estimated every six months from bottom-hole pressure tests with calculated adjustments from the original open flow tests at the time the wells were brought in. While it may be conceded that this method is not "theoretically accurate," still it is the only method upon which dependable data exist for this purpose. The only other method suggested would be to take open flow tests periodically; the result of which is of course unforseeable, otherwise it would be supererogatory. Certainly the present formula should not be stricken down in the absence of data supplying a more accurate method of determining potentials. Quoting from Railroad Commission v. Mackhank, Tex.Civ. App., 186 S.W.2d 351, 356:

"* * * But where, as here, it is shown that the rule contended for has never been applied to the field in question, but the rule or basis in vogue has been applied from the beginning and over a long period of years, without protest or objection, and acquiesced in by all interested parties, and where additionally, in order to apply the asserted rule actual tests would have to be made as an essential basis therefor, and no tests have been made or applied for; resort to the courts, without first applying to the Commission for relief, is premature."

If Standard's application to the Commission may be treated as one for periodic open flow tests, the record warrants the conclusion, if it does not impel it, that such tests in this Field are impractical, inadvisable, dangerous to workmen who would have to make them, and in fact productive of waste.

We do not understand that Standard seeks now or has ever sought abandonment of the average unit potential rule. To the contrary, in the specifications in Standard's supplement of October 15, 1945, to its application to the Commission its first request was adoption of a 40-acre unit system in lieu of that then in vogue. Such reduction in unit acreage would be advantageous to Standard by increasing its allowable to the extent Standard claims it was entitled under its estimated recoverable reserves. The evidence fails to demonstrate that this would be a *more equitable* distribution of the allowable than that in vogue. But even if it had, the Commission's formula should not on that account be stricken down. An analogous situation was presented in the Hawkins Field case, in which the Humble contended for a 60-40 allocation instead of the Commission's 50-50. This contention was overruled upon the authority of Corzelius v. Harrell, 143 Tex. 509, 186 S.W.2d 961; Marrs v. Railroad Comm., 142 Tex. 293, 177 S.W.2d 941; Railroad Comm. v. Mackhank Petroleum Co., 144 Tex. 393, 190 S.W.2d 802; Potter v. Sun Oil Co., 144 Tex. 151, 189 S.W.2d 482; and Brown v. Humble Oil & Refining Co., 126 Tex. 296, 83 S.W.2d 935, 87 S.W.2d 1069, 99 A.L.R. 1107, 101 A.L.R. 1093. The gist of the pertinent holdings in these cases is embodied in the following from the Mackhank case [144 Tex. 393, 190 S.W.2d 804]:

"The Court cannot strike down an administrative order on the ground that the evidence heard by the Court indicated that a more equitable one could be entered."

And the following from the Marrs case [142 Tex. 293, 177 S.W.2d 950]:

"* * * in passing on the validity of any scheme that may be worked out by the Commission for the handling of this problem, a reasonable margin will be allowed for differences of opinion and errors in judgment."

Both of these cases involved proration orders.

As bearing materially upon the actual operation of the unit system formula, a significant fact is that the bottom-hole pressure in the pressure plateau (highly productive portion of the structure, some 14,000 acres) was substantially uniform on July 1, 1946, and that no wells in this area had produced water. Drainage is the result of reservoir energy, and is reflected in differences in well pressures. The evidence warrants the conclusion, that after 20 years of operation, pressure variants were not sufficient to indicate drainage in this area.

The unit system was originally set up by the operators, in which Standard participated. With the exception of minor adjustments, some of which were necessitated by the litigation in the Whiteside case (Douglas Oil Co. v. State, 122 Tex. 369, 61 S.W.2d 804, and Federal Royalty Co. v. State, 128 Tex. 324, 98 S.W.2d 993) and other companion boundary cases, and Stanolind Oil & Gas Co. v. State, 136 Tex. 5, 133 S.W.2d 767, 145 S.W.2d 569, this system has not been changed, and, as stated, Standard's first complaint was in 1945, eight years after the 1937 order. And as said in the Hawkins Field case [193 S.W. 2d 829]:

"* * * it would seem clear that what the parties themselves thought of the propriety of the order or were willing to accept as being substantially just and fair to them, would have a material evidentiary bearing on the controversy."

The difficulties of formulating a proration plan have been frequently adverted to in Texas and Federal decisions. In the Rowan & Nichols Case (Railroad Comm. v. Rowan & Nichols Oil Co., 310 U.S. 573, 60 S.Ct. 1021, 1023, 84 L.Ed. 1368) this was referred to as "as thorny a problem as has challenged the ingenuity and wisdom" of the Commission, "in a domain of knowledge still shifting and growing, and in a field where judgment is therefore necessarily beset by the necessity of inferences bordering on conjecture even for those learned in the art". Therefore (the opinion reads), "it would be presumptious for courts, on the basis of conflicting expert

testimony, to deem the view of the administrative tribunal acting under legislative authority, offensive to the Fourteenth Amendment." This was written with reference to proration orders in the East Texas Field and quoted with approval in the Hawkins Field case.

One of Standard's witnesses, Mr. Baumel, the Commission's Director of Production and Chief Engineer of the Oil and Gas Division (who was also a witness in the Hawkins Field case), testified that allocation presents "the most difficult question we encounter," which "difficulty is intensified where a field has twenty years of producing history and 570 oil wells already drilled in it, and where people have already made their investments * * * especially where a field like the Yates Field is thrown into the Commission's lap after they have agreed upon something before proration came into effect and 200 wells had already been drilled." And further, "it is much easier to figure out a theoretical plan for allocation in a brand new field. * * * This field particularly has characteristics different than any other field. * * * It came in at a time when we had no proration; it was developed on a system of wide open flow with no proration. It was thrown into the Commission's lap after wells had been drilled under a system of no proration * * * but with a proration plan agreed on by the operators. The conditions are much, much different from sand fields, in that in a dolomite limestone field conditions vary from well to well." He described the Yates Field as the hardest he knew of in the U. S. to determine oil in place.

As to the small tracts, the record does not reveal that their allowables are excessive, in view of their natural advantages. Such advantages are generally recognized; and are conceded by Standard's expert witnesses. These natural advantages "may properly be taken into consideration in administering the conservation laws." Hawkins Field case.

Mr. Kyner, a witness for Standard, was a consulting petroleum engineer, with wide experience in Texas oil fields, and one time (1933-34) member of Yates Field Engineering Committee. He testified: "I think Yates, from a conservation standpoint, was and still is, a model. * * * In no other field in the State has there been so much work and so much effort exerted to bring about proper practices in accord with the conservation statutes and the rules and regulations of the Railroad Commission."

Upon consideration of the entire record we approve Mr. Baumel's following summation of the whole situation:

"Q. Now, a final question, Mr. Baumel. Considering the history of the Yates Field and the fact that porosity and certain other factors that you have described are unknown, I wish you would state whether or not from the standpoint of conservation, administration and petroleum engineering the present formula in the Yates Field, in your opinion, is a reasonable method of distributing allowables in the Yates Field?

"A. I would say it was reasonable insofar as it is the best we can do with it."

We attach no important significance to the issue of self-help. It seems manifest that Standard's failure to resort to more intensive drilling was due to the hazards already alluded to.

While we have considered all of the 18 points urged in Standard's brief (all of which we overrule) we shall advert to only one, other than those already discussed. This is point 8, which reads:

"The court should not have held· that the instrument of September 18, 1947, referred to in the judgment, containing three separate statements by three Commissioners constitutes a valid order, rule or regulation."

It is unimportant whether this "instrument" may properly be regarded as an "order" of the Commission. Standard's amended petition upon which it went to trial was filed July 21, antedating this "instrument" by nearly two months. In it Standard alleged the Commission had "failed and refused" to grant it relief. Meantime the Commission had continued its monthly allocation orders based upon the formula in issue; which constituted in effect monthly recurring refusals to effect any change. The Commission, represented by the Attorney General, has also resisted

Standard's suit ab initio; sought in the trial court and still seeks in this court to have its proration formula upheld. Standard was entitled to maintain the suit to test validity of the formula, regardless of the effect, if any, of the "instrument." This has not been denied it.

The trial court's judgment is affirmed.

Affirmed.