## THE ATLANTIC REFINING COMPANY ET AL V. THE RAILROAD COMMISSION OF TEXAS ET AL

No. A-7355. Decided March 8. 1961
Rehearing overruled May 31, 1961
(346 S.W. 2d Series 801)

---

*Black & Stayton, Small, Small & Craig,* of Austin, and *Houchins, Anderson, Smith & Null,* of Victoria, for appellants.

*Will Wilson,* Attorney General, *James N. Ludlum, Houghton Brownlee, Jr.* and *Linward Shivers,* Assistant Attorneys General, for Railroad Commission.

*Wallace H. Scott, Jr., Charles E. Crenshaw* and *Hart & Hart,* of Austin, and *Stasburger, Price, Kelton, Miller & Martin,* of Dallas, for *Bright & Schiff,* appellees.

*Walter R. Koch,* of Austin, for intervenors *Darsey, Darsey & Koch.*

MR. JUSTICE HAMILTON delivered the opinion of the Court.

This suit was brought in the 98th District Court of Travis County by The Atlantic Refining Company, Tidewater Oil Company, Mrs. James R. Dougherty, a widow, Dudley T. Dougherty, Rachael D. Vaughan and husband, Ben F. Vaughan, Jr., and May D. Carr, a widow, hereinafter collectively referred to as appellants, to annul an order of the Railroad Commission of Texas, hereinafter called the Commission, prorating gas and condensate production from the Slick, Luling and First Massive pay zones among wells in the Normanna Gas Field, Bee County. On December 16, 1957, field rules were enacted for the Slick, Luling and Second Massive pay zones in the Normanna Field. At a second hearing on February 26, 1958, field rules were adopted for the First Massive pay zone in said field. Atlantic at both of these hearings protested the adoption of the 1/3-2/3 rule, and introduced the same evidence at both hearings, except at the first hearing the First Massive was not shown to be productive. Said field rules included a proration formula for production in said field on the basis of 1/3 per well and 2/3 according to the amount of acreage. Specific complaint was made of such order in so far as it allows the production of gas, including the liquid content thereof, or the condensate, from

a well drilled by Bright & Schiff, a partnership, hereinafter called appellee, on a lot in the Normanna Townsite 79 feet wide and 130 feet long. Although this tract contains something less than 3/10 of an acre, it will be referred to hereinafter as the .3-acre tract, or the "Town Lot". W. G. Darsey, Jr., Joe T. Darsey and Walter R. Koch intervened in this suit and assumed the status of defendants.

Trial was to the court without a jury. Subsequent to judgment being entered for appellees, the following finding of fact was filed:

"Production of gas and condensate from the well drilled by defendant Bright & Schiff upon its lease containing approximately .3 acre under the rules of defendant Railroad Commission of Texas prorating the production of gas from the reservoirs in the Normanna Field, Bee County, Texas, will result in the drainage of a tremendous quantity of gas and condensate from other leases and tracts in the field, including leases and tracts in which plaintiffs own an interest, to said .3 acre lease, the precise amount of said drainage being incapable of ascertainment; and said drainage will not be compensated by drainage of gas and condensate from said lease containing approximately .3 acre to said other leases and tracts in the field, including leases and tracts in which plaintiffs own an interest."

Among the conclusions of law filed by the court is the following:

"2. Under the rule of unlimited right of capture laid down in *Ryan Consolidated Petroleum Corp. v. Pickens,* 285 S. W. 2d 201, the orders of defendant Railroad Commission of Texas complained of by plaintiffs are not invalid, even though production of gas and condensate under said orders will result in the uncompensated drainage of a tremendous quantity of gas and condensate from other leases and tracts in the Normanna Field, including leases and tracts in which plaintiffs own an interest, to the .3 acre lease upon which defendant Bright & Schiff has drilled its well."

A direct appeal from the adverse judgment holding the Commission's order valid and denying the plaintiffs the injunctive relief prayed for was brought to this court under Article 1738a, V.A.C.S., and Rule 499a, T.R.C.P. We hold that the order complained of is invalid.

In establishing the spacing pattern for the Normanna Field, it was determined that one gas well could reasonably drain 320

acres, and the Railroad Commission established a 320-acre spacing pattern in accordance with that determination. This spacing pattern is not at issue in this action.

Appellee Bright & Schiff applied for a permit to drill a well on its .3-acre tract under exception to Rule 37 on the ground that it was necessary to prevent confiscation of the oil and gas in and under its tract of land. On that ground the Railroad Commission granted the permit. There was expert testimony presented by appellant to the effect that a reasonable estimate of the value of gas in place under said tract was $7,000, and that if appellee Bright & Schiff is allowed to produce a well under this order some two and one-half million dollars' worth of gas will be produced in twenty years, the estimated life of the field. Such evidence further showed that this order will allow said well to produce at a rate of over 200 times as much gas per acre as a well on the 320-acre unit would produce.

The 1/3-2/3 formula means that 1/3 of the total field allowable must be divided equally among all the wells in the field and that 2/3 of the total field allowable will be divided among all the wells on a per acreage basis. Under this formula a well on a .3-acre tract would be allowed to produce many times more gas per acre than would a well on a 320-acre tract be allowed to produce. The Railroad Commission introduced no evidence at the trial. Appellee Bright & Schiff used two expert witnesses. The substance of their testimony was that there were not enough known facts available on which to base an estimate of the total field reserves in the Slick, Luling and First Massive sands, the three pay zones in the Normanna Field which are here involved, and the reserves under the Bright & Schiff tract. Both of appellants' expert witnesses and both of Bright & Schiff's expert witnesses testified that the extent of the field to the south had not been determined, and based partly upon this fact appellee's witnesses said that the total field reserves could not be determined. Appellants' witnesses from the known facts estimated what in their opinion would be the extent of the field, and based on their estimate of the size of the field determined the total field reserves, using the volumetric method. This is a complicated formula which takes into consideration various factors such as porosity, connate water, pressure, condensate within the given volume of gas samples, abandonment pressure, productive acre feet, etc. Appellee's witnesses testified that there were not enough wells drilled and the wells had not produced long enough to furnish the information for this system to be accurate. They contend that too many assumptions had to be made to fill in for the unknown factors. For instance, appellants' witnesses estimated reserves under the Bright & Schiff town lot by assuming that a well on that

tract would be an average well. There was no testimony at the trial as to what kind of well Bright & Schiff made on their tract. The well had not been drilled at the time of the Railroad Commission hearings, but it had been drilled at the time of the trial, and appellee did not choose to introduce any evidence as to whether said well was as good as an average well in the field. Appellee's witnesses do not say that the calculations made by appellants' witneses of a $7,000 value of gas in place under the Bright & Schiff town lot are incorrect, but say that from the evidence introduced at the trial an estimate of such reserves could not be made. They do not say that the estimate of $2,500,000 value of the gas which will be produced by Bright & Schiff under the 1/3-2/3 formula in twenty years is incorrect, but that there is not sufficient data upon which to base such estimate. Appellee's witnesses made no estimate whatsoever of the field reserves and made no estimate of reserves in place under the town lot well. There was no evidence introduced which would show that the town lot had any more gas per acre under it than was on the average under the other tracts in the reservoir. It appears from the record that whether the estimate of the field reserves made by appellants' witnesses was over estimated or under estimated, that there is not the slightest doubt but what there would be enormous drainage from the other tracts in the field, including those of appellants, to the Bright & Schiff tract under the 1/3-2/3 proration formula.

The statute which gives the Railroad Commission authority to regulate gas fields is Article 6008, V.A.C.S. The following is the substance of the sections of said act which are here pertinent:

Section 1 of said article states that the purpose of the act is to protect public and private interests against certain evils by prohibiting waste and compelling ratable production.

Section 10 enjoins the Commission to so regulate production as to prevent waste and adjust correlative rights.

Section 11 provides that the Commission shall exercise its authority to prevent waste when the presence of waste or imminence of waste is found, and shall exercise its authority to adjust correlative rights when the market demand for gas is exceeded by the capacity of the wells to produce gas from any reservoir.

Section 12 provides that when the Commisison has determined that conditions in a gas reservoir exist which give it authority to regulate, then it shall proceed to regulate and pro-

rate the gas production in such reservoir on a reasonable basis, and that the allowable allocated to each well shall be such as to give each well its fair share of the gas to be produced from such reservoir.

Section 13 provides that the Commission shall, in determining the allowable production for each well, take into consideration the size of the tract on which the well is located and the daily producing capacity of the well and "all other factors which are pertinent."

Section 15 provides that nothing contained in the article shall require the Commission to fix the allowable for any well below 50,000 feet per day, provided said well has a producing capacity of 200,000 feet or more, and not less than 25% of its open natural flow when it is less than 200,000 feet per day.

Section 22 provides that the Commission shall have broad powers to effectuate the provisions and purposes of the act.

Appellants maintain that the proration rule adopted by the Railroad Commission, viewed in the light of the substantial evidence rule, is unreasonable, arbitrary and confiscatory, and does not allow appellants to produce their fair share of the gas from the reservoir, and for this reason the order should be declared invalid and that its enforcement should be enjoined. Appellee contends in effect that the Railroad Commission can take into account what a .3-acre tract could have produced under the rule of capture before conservation laws restricted drilling and production in fixing a proration formula, and even though such formula results in an enormous drainage from the larger tracts to the small tract, the order is valid.

Appellants, in support of their contention that the Commission, in adjusting correlative rights in a gas field which it has undertaken to regulate, is required to so prorate as to prevent substantial drainage from one tract to another, cite the case of Corzelius v. Harrell, 179 S.W. 2d 419, in which the Supreme Court granted writ of error, but dismissed it as moot, 143 Tex. 509, 186 S.W. 2d 961. In that case Harrell owned about 94.8 per cent of the gas reserves in the Bammell Field, and Corzelius owned about 4.1 per cent thereof. Harrell was cycling gas, that is, was producing about 35 million cubic feet of gas per day from his leases, was extracting the liquid content therefrom, and was injecting the remaining dry gas, about 33 million cubic feet, into the reservoir from which it had been produced. As the result of this cycling operation Harrell was drying up the wet

gas reserves beneath the lease owned by Corzelius. Corzelius, on the other hand, was producing between four and five million cubic feet of gas per day from his lease, and was transporting this gas to an industrial fuel market in the city of Houston. Harrell had requested the Commission to prorate production of gas as required by Article 6008, V.A.C.S. The court held that the Commission was under the duty of fairly prorating gas production as between Harrell and Corzelius, not only the gas in the reservoir, but the liquid content thereof. In discussing this situation the court said:

"The record shows that Corzelius is producing by volume in excess of his fair share of the total net volume allowable from the field, and to that extent is creating a local net drainage, by volume, from Harrell's holdings. Harrell, on the other hand, though withdrawing by net volume only 2 MMCF daily, is processing 35 MMCF, extracting therefrom the valuable liquids, and is already reducing (draining) the liquid content of the gas from Corzelius' holdings. Corzelius is entitled to produce his fair share of the recoverable liquids, as well as his fair share of the volume of recoverable gas. Thus each is draining from the other's holdings, though of different elements of the total gas content." [179 S.W. 2d 425]

The court goes on to hold that it was the duty of the Railroad Commission to prorate production from the reservoir in question so that Corzelius' operations would not drain from Harrell's holdings, and that Harrell's operations would not drain from Corzelius' holdings. In support of its holding in the Corzelius case the court cited and quoted extensively from Henderson v. Terrell, 24 Fed. Supp. 147. That case involved an order of the Railroad Commission of Texas prorating the production of sour gas for carbon black in the West Panhandle Field and involved the construction of Article 6008a, V.A.C.S., which directed the Commission to so allocate production between wells as to prevent cognizable and preventable drainage of gas from tracts of land in sour gas producing areas. However, the court in the Harrell case construed that opinion as being applicable to the situation here, where the Commission is required by said Article 6008 to allocate production between the wells so as to allocate to each well its fair share of gas from the reservoir. The court quoted with approval the following from the opinion in Henderson v. Terrell:

"We think the statute is simply and clearly phrased to give effect to a public policy, and to exercise the police power in respect to matters which the courts of Texas and of the United States uniformly hold it is the right of the state by statute, to control. This right extends to preventing one person from unduly draining from under the lands of another, oil and gas lying in a common pool equally when the undue drainage is for wasteful uses, and when the rule of capture no longer applying, because of lawful statutory limitation, one of the owners, by drawing more than his due proportion of the limited share, is draining the lands of his co-owners.

"We find nothing unreasonable in the statute, nothing unreasonable in the orders. For all that the statute does, all that the orders do, is to make limitation and proration effective by putting an end to an existing unreasonable drainage condition, and preventing its continuance in the future. Neither the statute nor the order operates retrospectively, either punitively or reparatively; both operate prospectively. So operating, they merely say to plaintiffs 'you may produce from your wells of the total amount limited in a due proportion with every other well in the field. You may not produce more'."

After this quotation the Court of Civil Appeals said in the Corzelius case: "The decision in that case (Henderson v. Terrell) rests, in our opinion, upon sound and well-established legal doctrine which controls the instant case." [179 S.W. 2d 425]

While the Supreme Court granted a writ of error in the Corzelius case and dismissed it as moot in [143 Texas 509] 186 S.W. 2d 961, the opinion of the Supreme Court did not in any way disturb the holding of the Court of Civil Appeals. It appears that at the time the Supreme Court passed on the matter a new and different order had been entered by the Railroad Commission and the order passed on by the Court of Civil Appeals was not then in effect. However, the Supreme Court, in Corzelius v. Harrell, 143 Texas 509, 186 S.W. 2d 961, at p. 968, did have this to say:

" 'To adjust correlative rights' the Commission is authorized by this law to consider many items that relate to the production of gas, and it further provides that the Commission shall consider 'all other factors which are pertinent.'

The courts have frequently sustained the exception to Rule 37 'to prevent confiscation of property', (originally 'to protect vested rights'). The criterion fixed by the Legislature relating to the adjustment of correlative rights is as definite as that fixed by law to authorize the Commission 'to prevent confiscation of property' under Rule 37. Trapp v. Atlantic Refining Co., Tex. Civ. App., 169 S.W. 2d 797; Nash v. Shell Petroleum Corporation, Tex. Civ. App., 120 S.W. 2d 522; Atlantic Oil Production Co. v. Railroad Commission, Tex. Civ. App., 85 S.W. 2d 655; Gulf Land Co. v. Atlantic Refining Co., 134 Tex. 59, 131 S.W. 2d 73."

Appellants also cite the case of Marrs v. Railroad Commission, 142 Texas 293, 177 S.W. 2d 941, by this court. This was an oil proration case, but it involved the question of drainage such as we now have before us. The case was concerned with a proration order affecting the McElroy and Church Fields in Crane and Upton Counties, in Texas. The Church Field, which was initially considered to be separate from the McElroy Field, was densely drilled on a 10-acre pattern and was substantially depleted at the time proration became effective, only 15% of its original recoverable reserves remaining. The Inside McElroy, which was later discovered and was being drilled and developed on a spacing pattern of 17.8 acres, was revealed as connecting up the McElroy and Church Fields. At the time proration went into effect 80% of the recoverable reserves of the Inside McElroy Field remained in the ground. Prior to the effective date of proration, and to protect the Inside McElroy from drainage to wells in the Church Field area, the Gulf Oil Company drilled a tier of wells along its southern boundary which it permitted to flow at full capacity. However, under the restricted allowables established by the Commission this was no longer possible, and Gulf and Marrs asked the Commission to annul the proration order, which allowed the Church Field to produce almost as much as the McElroy, on the ground that the oil in place under their leases was being confiscated through uncompensated drainage to the Church Field. In setting aside the order, the court said:

"Under the settled law of this State oil and gas form a part and parcel of the land wherein they tarry and belong to the owner of such land or his assigns (31 Tex. Jur. 518; Texas Co. v. Daugherty, 107 Tex. 226, 176 S.W. 717, L.R.A. 1917F, 989; Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S.W. 290, 29 A.L.R. 566; Lemar v. Garner, 121 Tex. 502, 50 S.W. 2d 769; Hager v. Stakes, 116 Tex.

453, 294 S.W. 2d 835) ; and such owner has the right to mine such minerals subject to the conservation laws of this State. Every owner or lessee is entitled to a fair chance to recover the oil or gas in or under his land, or their equivalent in kind, and any denial of such fair chance amounts to confiscation. Gulf Land Co. v. Atlantic Ref. Co., 134 Tex. 59, 131 S.W. 2d 73; Railroad Commission of Texas et al. v. Gulf Production Co., 134 Tex. 122, 125, 132 S.W. 2d 254.

"Under the findings of the trial court the allowables as fixed by the Railroad Commission for the two areas are entirely out of proportion to the potentials thereof. They are not in proportion to the oil under the different areas. It is very evident that petitioners are not being permitted to mine their just proportion of the oil. There is several times as much oil underlying petitioners' land as there is under the land in the Church-Fields area, yet those in the Church-Fields area are being permitted to mine nearly as much oil as are petitioners. As the oil is taken from the depleted Church-Fields area it is replaced by oil drained from petitioner's property. If petitioners were free to fend for themselves they could mine the oil under their land and thus prevent its escape to the adjoining area. But the orders of the Railroad Commission here complained of prevent petitioners from so doing. As a result, petitioners are being forever deprived of their property. It is the taking of one man's property and the giving it to another."

Appellants also cite Brown v. Humble Oil & Refining Company, 126 Tex. 296, 83 S.W. 2d 935, 99 A.L.R. 1107, which is a case involving the construction of Rule 37 and the exceptions thereto. In an exhaustive opinion holding invalid the Commission's order in granting a permit under exception to Rule 37 the court said:

"Conditions may arise where it would be proper, right and just to grant exceptions to the rule so as to permit wells to be drilled on smaller tracts than prescribed therein. Also, conditions may arise where it would be proper, right and just to permit tracts to be subdivided and such subdivisions drilled after the adoption of the rule; but in all such instances it is the duty of the Commission to adjust the allowable, based upon the potential production, so as to give to the owner of such smaller tract only his just proportion of the oil and gas. By this method each person will be entitled to

recover a quantity of oil and gas substantially equivalent in amount to the recoverable oil and gas under his land. * * *

"The commission, in order to prevent waste, has the power to limit the rate of flow in the same way that it has the power to regulate spacing. See Champlin Refining Co. v. Corporation Commission, 286 U. S. 210, 52 S. Ct. 559, 76 L. Ed. 1062, 86 A.L.R. 403; Danciger Oil & Refining Co. v. Railroad Commission (Tex. Civ. App.) 49 S.W. (2d) 837. This right to control the rate of flow in order to prevent waste also enables the commission to offset the advantage obtained by one who is given an exception to the spacing rule by limiting his allowable production to the extent necessary to overcome this advantage. In this way the commission, by controlling the oil stored in the common reservoir, is enabled to carry out the dominant purpose of preventing waste, and, at the same time, permit each owner to enjoy the opportunity fully to realize upon his estate by developing and recovering his oil and gas. * * * "

In the case of Railroad Commission of Texas et al. v. Gulf Production Company, 134 Tex. 122, 132 S.W. 2d 254, the question involved was the validity of a Railroad Commission order granting a permit under exception to Rule 37 which had been granted "to prevent the confiscation of property." The application was for a third well on a 4.77-acre tract. In holding that the order was invalid, this court said:

"In the Gulf Land Company case, supra, [Gulf Land Company v. Atlantic Refining Company, 134 Tex. 59, 131 S.W. 2d 73] we held that the term 'confiscation,' as used in Rule 37, refers principally to drainage. We also held that every owner or lessee is entitled to a fair chance to recover the oil or gas in or under his land, or their equivalents in kind, and that any denial of such fair chance would be confiscation. We still adhere to such holdings. We think it would follow from the above rule that when an owner or a lessee has been given a fair chance to recover his oil and gas, as above defined, he has received his legal rights in regard thereto. We think the opinion of the Court of Civil Appeals demonstrates that the fact of this record show, as a matter of law, that the two wells Tippett already has on this tract of land will protect him against confiscation,—that is, will insure him a fair chance to recover the oil and gas in and under his land, or their equivalents in kind. We think the

opinion of the Court of Civil Appeals further demonstrates that the facts of this record show, as a matter of law, that a third well on this tract would enable Tippett to recover more than his fair share of the oil and gas in or under his land, or their equivalents in kind. Under such a record, the granting of this permit to prevent confiscation was an abuse of power on the part of the commission, and therefore unlawful."

In Magnolia Petroleum Co. v. Railroad Commission, 93 S.W. 2d 587, writ refused, the court in considering Magnolia's right to drill an eleventh well on its tract said:

"The right of each individual leaseholder extends no further than the opportunity to extract his fair share of the oil, measured by a reasonable approximation of the amount of oil in place under his leasehold."

In Atlantic Oil Production Co. v. Railroad Commission, 85 S.W. 2d 655, writ dismissed, the court in considering the right of the operator to drill a third well on his tract said:

"Appellee is entitled, and entitled only, to be accorded an equal opportunity with surrounding lessees to recover his fair share of the recoverable oil; or, stated differently, to recover the approximate amount of oil lying in place under his lease."

In addition to the case of Ryan Consolidated Petroleum Corporation v. Pickens, 155 Tex. 221, 285 S.W. 2d 201, cited by the trial court in support of its judgment, the appellees rely principally upon the Hawkins Field case, Railroad Commission v. Humbe Oil & Refining Co., 193 S.W. 2d 824, writ refused, n.r.e., and the Yates Field case, Standard Oil Co. v. Railroad Commission, 215 S.W. 2d 633, writ refused, n.r.e. The Ryan case was not a proration case. It was a contest between Ryan on the one hand and Pickens and Coffield on the other over the production from four lots in the Hawkins Townsite. These lots originally constituted a tract under single ownership, and were subdivided after Rule 37 became effective. Pickens acquired a lease on Lots 10 and 11 and Ryan on Lots 12 and 13. Both applied to the Commission for permits to drill on the four lots. The application of Pickens was granted and that of Ryan was denied. After considerable litigation over the validity of the permits Pickens' permit was upheld in court, and he drilled his

well upon Lots 10 and 11. Ryan filed suit for equitable relief, alleging confiscation of the oil and gas under Lots 12 and 13 by Pickens and Coffield. The only issue presented in the court was that of "who was entitled to the production from the Pickens well." The court said:

> "Petitioner's contention that this case is one for equitable relief should not be sustained for the further reason that its position is inconsistent with the law of capture, which is a well-settled rule of property in this jurisdiction. The rule of capture is simply this—that the owner of a tract of land acquires title to the oil and gas which he produces from wells drilled thereon, though part of such oil or gas may have migrated from adjoining land. The Railroad Commission is without power from the Legislature or by decisions of this Court to do anything more than declare illegal the drilling of wells which are prohibited by Rule 37. The Railroad Commission cannot change the law of Texas. The Legislature of this State has heretofore conferred broad, extensive and exclusive regulatory powers upon the Railroad Commission of Texas in the regulation of the oil industry of this State, but the Commission has not been given the power to determine property rights as between litigants. The courts, whether sitting as court of law or equity, determine such matters in accordance with existing laws in Texas." [155 Texas, 221, 285 S.W. 2d 207.]

As can be determined from this language, the court defined "the rule of capture" in clear and unmistakable terms, and as defined "the rule of capture" is simply this: the owner of a tract of land acquires title to the oil which he produces from wells thereon, although part of such oil or gas may have migrated from the adjoining land. The permit to drill was granted for the four lots. Whichever one got the permit and drilled the well was entitled to all the oil produced. The court refused to recognize the voluntary subdivision of the lots after Rule 37. The court in its definition clearly followed the law as declared by the Commisson of Appeals in Japhet v. McRae, 276 S.W. 669, in which the court said:

> "It seems to us that the only safe rule, and the only one free from much confusion, is one which gives the oil to the man who owns the land upon which the well is located."

The effect of the holding in this case was that Pickens and

Coffield, having been granted the well permit for the four lots, could legally produce the oil under the four lots, and under "the rule of capture" as defined above they owned all of the oil produced from the well. Except for the voluntary segregation of Lots 10 and 11 from Lots 12 and 13 after Rule 37, Pickens and Coffield would not have had the exclusive right to produce the oil from under all four lots. Prior to Rule 37 Ryan could have drilled a well and produced oil from under Lots 12 and 13. It was the application of Rule 37 which gave Pickens and Coffield the right to produce such oil and not the rule of capture. It was, however, the rule of capture which prevented Ryan from collecting damages from Pickens and Coffield for the oil drained from beneath Ryan's lots.

In the case presently before the court The Atlantic Refining Company et al. are not seeking to collect damages from Bright & Schiff for gas drained from beneath their lease, but are seeking to have an order of the Railroad Commission declared invalid, the enforcement of which they allege will necessarily result in the drainage of gas from their leases to the Bright & Schiff lease. If we should hold valid the Railroad Commission order, of which The Atlantic Refining Company et al. herein complain, The Atlantic Refining Company et al. would have no recourse for damages against Bright & Schiff regardless of the alleged drainage. The rule of capture as defined in Ryan Consolidated Petroleum Co. v. Pickens and Coffield et al. would prevent such relief. The gas produced by Bright & Schiff would belong to them regardless of the fact that 199/200 of the gas produced may have come from the leases of appellants. We therefore say that the Ryan case is not authority for the trial court's conclusion of law set forth, supra, nor the holding of the court that the Railroad Commission order is valid.

As we construe the opinion in the Humble case, 193 S.W. 2d 824, the court held in that case that the Commission could, in fixing well allowables, take into consideration certain factors such as the cost of production to the owner of a small tract and the savings realized by owners of large tracts who would not be required to drill wells to offset drainage in administering conservation laws. Further, that court said that the allowable to an owner of a small tract could not be reduced to the point where his well could not be drilled and operated at a reasonable profit. The opinion elsewhere, however, after citing Brown v. Humble Oil & Refining Company, 126 Tex. 296, 83 S.W. 2d 935, 87 S.W. 2d 1069, and Corzelius v. Harrell, 186 S.W. 2d 961, recog-

nizes the restrictions which the conservation laws have placed upon the common law right of an owner to drill as many wells on his land as he pleases and to produce as much as he pleases. At page 832, of 193 S.W. 2d the court commented:

> "Any restriction upon the number of wells drilled or the amount of production therefrom is essentially an infringement upon the right of private property, and can only be upheld as a conservation measure. In the exercise of this right of curtailment it is generally recognized that the rules and regulations adopted must, as far as practical, and within reasonable limitations, afford the several property owners a fair opportunity to produce the recoverable oil underlying their lands or its equivalent."

The record in the Humble case shows that the Railroad Commission's rules had been in effect in that field for a considerable period of time without the validity of such rules having been challenged in the courts.

The Standard Oil Company case (Standard Oil Co. v. Railroad Commission, 215 S.W. 2d 633, error refused, n.r.e.), involved oil proration in the Yates Field. The Yates Field was discovered long prior to the conservation laws and the Standard Oil Company had concurred with the rules established and agreed to by the operators in that field. After proration became effective the Railroad Commission merely adopted the rules which had already been set up with the recommendation and consent of the operators. In upholding the order of the Railroad Commission the court pointed to the fact that there were sharp conflicts in the testimony of witnesses as to the effect of the Commission's order, and that the parties had complied for a long period without protest or objection.

■ We are in agreement with the reasoning of the courts in the Humble and Standard Oil Company cases in holding that where producers have acquiesced in and have failed to complain of the Commission's proration orders for a long period, during which time other operators have expended vast sums in exploration and drilling operations, such producers should not be heard to complain.

In the case of Railroad Commission v. Mackhank Petroleum Co., 186 S.W. 2d 351, cited by appellee, the court held that under the field spacing pattern the complaining party could drill ad-

ditional wells and protect himself from drainage. The opinion of the Supreme Court in 144 Tex. 393, 190 S.W. 2d 802 did not deal with the allocation issue.

In the Rowan and Nichols cases (Railroad Commission v. Rowan & Nichols Oil Company, 310 U. S. 573, 60 Sup. Ct. 1021, 84 L. Ed. 1368, and Railroad Commission v. Rowan Oil Company, 311 U. S. 570, 61 Sup. Ct. 343, 85 L. Ed. 358, both of which involved oil proration orders in East Texas, and which are cited and relied on by appellee, the Supreme Court reversed the judgment of the lower courts setting the Commission orders aside. In so doing the court pointed out serious conflicts in the testimony, saying that in the face of such conflicts Federal Courts should not substitute their judgments for those of the Commission. In effect, it concluded that the validity of such orders should be left to the final decision of the courts of Texas.

■ After reviewing and considering the principles expressed in the cases above referred to in connection with the plain provisions of Article 6008, V.A.C.S., we feel compelled to hold, under the facts of this case, that the 1/3-2/3 proration formula promulgated by the Railroad Commission for the Normanna Field is invalid. The order allows a well on a .3-acre tract to produce gas at a rate many times greater per acre than a well on a 320-acre tract is allowed to produce, and we find no substantial evidence in the record justifying such a wide discrepancy in the rate of production. Viewing all the facts in the light of the substantial evidence rule, we think the 1/3-2/3 proration formula is an unreasonable basis upon which to prorate the gas production from this reservoir. It does not come close to compelling ratable production; neither does it afford each producer in the field an opportunity to produce his fair share of the gas from the reservoir. Appellee says that prior to the conservation laws one could drill as many wells as he pleased and produce as much gas as he pleased, and under that situation may have been able to drain as much or more gas from his neighbors as this proration order will allow it to do, and that for that reason this proration order is valid. They contend that whatever advantage a small tract would have had prior to conservation laws, it is entitled to a similar advantage under the proration laws. We do not think the principles stated in the cited cases by this court support that view.

As pertaining to the question generally before this court see: Vol. 31, Texas Law Review, pp. 113 to 122; article entitled "Oil-

Well Spacing Regulations and Protection of Property Rights," by Robert E. Hardwicke; Vol. 12, Baylor Law Review, article entitled "A Century of Correlative Rights," by R. O. Kellam; Vol. 16, Texas Law Review, article entitled "Property Rights in Oil and Gas and Their Effect Upon Police Regulations," by A. W. Walker.

■ It has been suggested in some of the briefs that this court might set some rule or standard by which the Commission should be guided in regulating the production of gas. This the court will not undertake to do. We recognize that the Railroad Commission alone is authorized to make the rules regulating the production of oil and gas. While such rules are subject to review by the courts, a court cannot substitute its judgment for that of the Commission. A court can only pass on the validity of a rule or order when properly presented to it for review. The responsibility rests with the Commission to devise some rule of proration which will conserve the gas in the field in question and at the same time be fair and just to all parties without depriving any of them of his property. As is provided in said Article 6008, Section 22, the Commission is given broad discretion in accomplishing the purpose of giving each party an opportunity to produce its fair share of the gas in the reservoir.

The judgment of the trial court is reversed and this case is remanded with instructions to enter judgment declaring the proration order of the Commission invalid and granting the injunction preventing the enforcement thereof.

ASSOCIATE JUSTICE WALKER and STEAKLEY not sitting.

MR. JUSTICE SMITH, joined by JUSTICE GRIFFIN, dissenting ON MOTION FOR REHEARING.

Assuming that the Supreme Court of Texas has jurisdiction of this case, it is our duty to decide the controlling questions presented. These questions necessarily must be decided in the light of the entire record. The Appellees, Bright & Schiff et al., have, in my opinion, filed a very able brief in support of their motion for rehearing. I might add that thorough and exhaustive briefs have been filed by Appellants, as well as amicus curiae briefs in support of and against the motion. The Attorney General of Texas, in behalf of the Railroad Commission of Texas, has continued to defend the order of the Commission. The At-

torney General not only joins Bright & Schiff in its motion for rehearing, but has filed a compelling and forceful supplemental brief in support of the motion.

A review of the record has led me to believe that the motion for rehearing should be granted for the reasons now to be stated.

The plaintiffs, Atlantic Refining Company et al. shall hereafter be referred to as plaintiffs. The defendants, Bright & Schiff et al. shall hereafter be designated as defendants, and the defendant, The Railroad Commission of Texas, shall hereafter be referred to as the Railroad Commission or the Commission.

This suit was brought by the plaintiffs in the Ninety-Eighth District Court of Travis County, Texas, against the defendants to annul certain orders of the Commission. In a trial to the court, without the intervention of a jury, the Commission's orders were held to be valid and all injunctive relief as prayed for by the plaintiffs was denied.

The plaintiffs have perfected a direct appeal to this court under Article 1738a, Vernon's Annotated Civil Statutes, and Rule 499a, Texas Rules of Civil Procedure. They complain, as they did in the trial court, of orders of the Railroad Commission entered on December 16, 1957, and May 13, 1958, the first of which orders adopting field rules for the Normanna (Slick Sand) Field, the Normanna (Luling Sand) Field, and the field rules for the Normanna (Second Massive Wilcox) Field, and the second of which orders adopting field rules for the Normanna (First Massive Wilcox) Field. Plaintiffs do not attack the orders in their entirety. Plaintiffs object only to that portion of said orders that allocate the allowable production among all wells in each reservoir on the basis of "two-thirds, one-third"; that is to say, two-thirds of the total allowed gas production for the entire reservoir is allocated to the wells therein in that proportion that the acreage assigned to a well bears to the sum of the acreage in the reservoir, and one-third of such total allowed gas production is allocated equally among the wells in the reservoir. This portion of the order is contained in "Rule 3." It was this portion of the field rules that was labeled by the plaintiffs as being "illegal, unjust, arbitrary, unreasonable, and discriminatory." Plaintiffs sought in the trial court and seek here the following relief: "(1) That the court adjudicate that the

provisions of the special field rules adopted by the Commission for the Normanna Field, Bee County, Texas, that allocates production among the wells therein are null and void; and that the same are set aside and cancelled *and the Commission enjoined from granting production to said wells on the basis thereof;* (2) that plaintiffs have their cost and any other and further relief to which they may show themselves entitled." (Emphasis added.)

The question occurs: What is the exact form of the relief that plaintiffs request? Is the injunctive relief sought that the Railroad Commission be enjoined merely from granting production under these particular allocation orders only, or do the plaintiffs request that the Railroad Commission be enjoined from granting production to any operators in the field under any circumstances until an order is adopted by the Commission that will give to each operator only his gas in place? It cannot be that plaintiffs desire the first. Incidentally, the Railroad Commission does not "grant" production to wells under the orders. It neither grants nor denies production to wells in any given field. Therefore, the mere allocation of the allowable on the basis of a "two-thirds, one-third" rule will not cause any immediate and irreparable injury to the plaintiffs. Production, and only production, will cause such injury.

This court has held that portion of the orders that allocates the allowable production invalid and has instructed the trial court to grant an injunction "preventing the enforcement thereof." Neither this court nor the trial court can write a new order. This court's opinion, of course, does not make the slightest suggestion as a guide to the Railroad Commission. Naturally, any suggestion would have been meaningless. This court knows that the plaintiffs were not asking for relief that would merely require inaction on the part of the Railroad Commission. What would be the result if the Commission took no action at all? Until field rules are set by the Commission, production in the Normanna Fields will be automatically governed by statewide Rule 25, which allows each well to produce 25 per cent of its open flow. The witness, Bellanfonte, testified that the Bright & Schiff (defendants) well will be entitled to produce *three times* as much under the statewide rule. Plaintiffs admit that all wells in the field are average wells. Therefore, the statewide rule would place all wells in the field, including the Bright & Schiff well, on an equal basis, in so far as the production is concerned.

What the plaintiffs are actually requesting here is that the production from the Normanna Fields be stopped. It must be admitted that they cannot just stop the production from the Bright & Schiff well and allow production to continue under the other wells in the field. The field rules are applicable to all wells alike. Plaintiffs are not asking for an injunction directly against the operators prohibiting all production. They are seeking an injunction against the Railroad Commission to restrain it from *"granting"* production on any basis to the wells in the fields.

In any event, this is not a situation such as existed in the cases of Railroad Commission v. Shell Oil Co., 146 Tex. 286, 206 S.W. 2d 235 (1947), and Railroad Commission v. Sterling Oil & Refining Co., 147 Tex. 547, 218 S.W. 2d 415 (1919). In those cases the plaintiffs sought an injunction to restrain the Commission from enforcing orders against them. Here the plaintiffs are asking, in effect, that this court issue an injunction ordering the Railroad Commission to shut in the production from the Normanna Fields.

Basically, the questions for determination are: Can the owner of any separate tract, no matter how small, which is not an illegal subdivision, be compelled by the Commission to unitize his tract with adjoining lands; and (2) if he is entitled to drill at least one well on his separate tract, and cannot be compelled to unitize, then what amount of gas can he produce from his well?

It is well established that there can be no compulsory unitization in Texas. To grant the injunction in the present case would practically effect unitization.

The argument presented by the plaintiffs has been consistently and uniformly rejected by the courts. It has been consistenly held that the owner of a small tract (.3 of an acre), not an illegal subdivision, *as a matter of law* is entitled to a well upon his tract, no matter how small the tract may be. Dailey v. Railroad Commission, Tex. Civ. App., 133 S.W. 2d 219, wr. ref.; Stanolind Oil & Gas Company v. Railroad Commission, Tex. Civ. App., 96 S.W. 2d 664, no writ hist.; Nash v. Shell Petroleum Corporation, Tex. Civ. App., 120 S.W. 2d 522, wr. dism.; Railroad Commission v. Delhi-Taylor Oil Corporation, Tex. Civ. App., 302 S.W. 2d 273, wr. ref. n.r.e.; Halbouty v. Darsey, Tex. Civ. App., 326 S.W. 2d 528, wr. ref. n.r.e.; Foster v. Rail-

road Commission, Tex. Civ. App., 326 S.W. 2d 533, wr. ref., n.r.e.

All of the above cases, just as our case, relate to the right of the owner of a small tract to drill his first well on his tract. They are not cases which involved the right to drill additional wells. The court cites several of these *additional* wells cases. They are not in point. The court quotes from such cases as Magnolia Petroleum Company v. Railroad Commission, Tex. Civ. App., 93 S.W. 2d 587, wr. ref.; Atlantic Oil Production Company v. Railroad Commission, Tex. Civ. App., 85 S.W. 2d 655, wr. dism., and Railroad Commission v. Gulf Production Company, 134 Tex. 122, 132 S.W. 2d 254. These cases involved the right to drill an eleventh well in the first case, and the last two cases involved the right to drill a third well. No question of the right to drill additional wells on the Bright & Schiff tract is involved here.

The lack of authority of the Railroad Commission to compel pooling or unitization, and the uniform holding that the Commission has no authority to compel pooling or unitization is made clear by the provisions of paragraph (g) of Article 6014, which reads as follows:

"(g) Waste or loss incident to, or resulting from, the unnecessary, inefficient, excessive or improper use of the reservoir energy, including the gas energy or water drive, in any well or pool; however, *it is not the intent of this Act to require repressuring of an oil pool or that the separately owned properties in any pool be unitized under one management control or ownership.*"

This statute should be construed in connection with Article 6008(b), Vernon's Annotated Civil Statutes, which authorizes the establishment of pooled units for certain purposes. Section 1 of Article 6008(b), supra, however, contains an express provision that no person shall be compelled or required to enter into any such pooling agreement:

"Such agreements shall not bind any land owner, royalty owner, lessor, lessee, overriding royalty owner or any other person who does not execute them, but shall bind only the persons who execute them, their heirs, successors, assigns and legal representatives; *but no peron shall be compelled or required to enter into such an agreement.*" (Emphasis added.)

See Pickens v. Ryan Consolidated Petroleum Corporation, Tex. Civ. App., 219 S.W. 2d 150, wr. ref. n.r.e.; Ryan Consolidated Petroleum Corporation v. Pickens, 266 S.W. 2d 526, affirmed in Ryan Consolidated Petroleum Corporation v. Pickens. 155 Tex. 221, 285 S.W. 2d 201; Nale v. Carroll, Tex. Civ. App., 266 S.W. 2d 519, affirmed in Nale v. Carroll, 155 Tex. 555, 289 S.W. 2d 743. In this latter case, the Court of Civil Appeals held:

"It is well established that there can be no compulsory unitization in Texas, and to yield to the claims of appellants in this case would practically effect unitization."

In the Ryan case, this court said:

"The petitioner knew that the Railroad Commission did not have the power to cause a merger or unitization of the separately owned leasehold rights of respondents in Lots 10 and 11 with those of petitioner." 155 Tex. 221, 285 S.W. 2d 207.

In the recent case of Halbouty v. Darsey, supra, the Court of Civil Appeals held that the granting of a permit by the Railroad Commission on a .48 acre tract under spacing Rule 37 was not improper because oil and gas from surrounding tracts would drain to the tract, since such drainage would be part of the law of capture. This court refused the application for writ of error. It is true the refusal was with the notation n.r.e. However, undoubtedly this court approved the holding, otherwise it would have granted the writ.

The plaintiffs would have us believe that this is a cause between small tract owners and large tract owners.The opposite is true. At the time of the Railroad Commission hearing the plaintiffs were just as much "small tract owners" as was Bright & Schiff's predecessors in title. The plaintiffs, Atlantic, Tidewater, and Dougherty owned an undivided interest in all of the town lots in the townsite area and owned small lots throughout the field. The plaintiffs could have exercised their own right of capture, but they elected to unitize their small tracts and emerged as "large tract" owners. The question arises: Is the Railroad Commission under such circumstances required to nullify the rights of the owner of a small tract by so limiting his production that he will have no incentive to take the risk of going ahead and drilling his own well? It is inconsistent to say that the Railroad Commission is required to take away with one hand what the law says it has to give with the other hand.

The right of the owner of a well depends fundamentally upon the law of property. The Texas law of property in oil and gas has been defined by this court as embracing *two* parts of *equal force and dignity;* the *law* of ownership in place, and the *law* of capture.

The majority opinion quotes from Brown v. Humble Oil & Refining Company, 126 Tex. 296, 83 S.W. 2d 935, but in my opinion, it misses the basic statement of the law in that case which is applicable here:

> "The rule in Texas recognizes the ownership of oil and gas in place, and gives to the lessee a determinable fee therein. Lemar v. Garner, 121 Tex. 502, 50 S.W. 2d 769; Humphreys-Mexia Co. v. Gammon, 113 Tex. 247, 254 S.W. 296, 29 A.L.R. 607; Waggoner Estate v. Sigler Oil Co. 118 Tex. 509, 19 S.W. 2d 27; Texas Co. v. Dougherty, 107 Tex. 226, 176 S.W. 717, L.R.A. 1917 F. 989."

> "Owing to the particular characteristics of oil and gas, the foregoing rule of ownership of oil and gas in place should be considered in connection with the law of *capture.* This rule gives the right to produce all the oil and gas that will flow out of the well on one's land; and *this is a property right.* And it is limited only by the physical possibility of the adjoining landowner diminishing the oil and gas under one's land by the exercise of the same right of capture. * * * *Both rules are subject to regulation under the police power of a state."* (Emphasis added.)

The expression of the court, supra, when it said "by the exercise of the same right of capture" simply means that the answer to the rule of capture *is* the rule of capture. "The correlative right to the law of capture was the law of capture. Ralph B. Shank, "Present Status of Law of Capture", Proceedings of the 6th Annual Institute on Oil & Gas Law and Taxation, 257 at 272. This court in the Brown v. Humble case summed up the answer to the plaintiffs here, when it said: "And it [the law of capture] is limited only by the physical possibility of the adjoining landowner diminishing the oil and gas under one's land by the exercise of *the same right of capture."*

The plaintiffs in this case have, through closely related litigation, fought Bright & Schiff at every turn. They contested the granting of the permit. As early as December 1958, and after Bright & Schiff was granted the right to drill on its small tract, plaintiffs sought to intimidate drilling contractors and to construct buildings and structures on land adjacent to the

Bright & Schiff drill site and to drill a water well theron. Bright & Schiff had obtained a surface lease on two lots and part of a third lot to accommodate the necessary pits, pumps, tanks, and equipment to be used incident to the drilling of a well on the lot under which they owned the minerals. Bright & Schiff sought injunctive relief against the plaintiffs asking that they be restrained from interfering with their drilling activities. The Bee County District Court found that the activities of the plaintiffs were conducted for the sole and only purpose of willfully and unlawfully obstructing, hampering and preventing the Bright & Schiff drilling operations. The injunction followed, and the trial court's judgment was affirmed by the Court of Civil Appeals. See The Atlantic Refining Company et al. v. Bright & Schiff, Tex. Civ. App. 321 S.W. 2d 167, wr. ref. n.r.e.

The plaintiffs made the contention in that case that the use of the surface to the three lots would enable Bright & Schiff to complete a gas well on *its small lot* which will drain minerals from beneath the lots under which the plaintiffs owned the minerals. One of the plaintiffs, The Atlantic, emphasized that the gas reserves beneath the Bright & Schiff lot was worth only $15,000, whereas a completed well would be worth a million dollars because gas would flow from beneath the Atlantic's leases. The Court of Civil Appeals disposed of this contention with the terse statement that "The trial court found that Atlantic would suffer no drainage at all. [The court was referring to the same well we are concerned with here]. Drainage presents no new problem. The rule of capture is settled law. Ryan Consolidated Petroleum Corp. v. W. L. Pickens, 155 Tex. 221, 285 S.W. 2d 201; Eliff v. Texon Drilling Co., 146 Tex. 575, 210 S.W. 2d 558. *Under that rule,* an injunction may not be used as an instrument to protect a lessee from the risk of drainage. Prairie Oil & Gas Company v. State, Tex. Comm. App., 231 S.W. 1088."

This court refused a writ of error, n.r.e., in spite of the contention of Atlantic et al. in its application for writ of error that "Drainage of petitioner's minerals was established as a matter of law." By our action in refusing the writ, we sustained the contention that drainage is not illegal in and of itself. Thus, in my opinion, we followed our holding in Ryan v. Pickens, supra, that "Petitioner's contention that this case is one for equitable relief should not be sustained for the reason that its position is inconsistent with the law of capture, which is a well-settled rule of property in this jurisdiction. The rule of capture is simply this — that the owner of a tract of land acquires title to the oil and gas which he produces from wells drilled thereon,

*though part of such oil or gas may have migrated from adjoining land.* 285 S.W. 2d at 207. The rule of capture has become a property right." This rule was not first announced in Ryan v. Pickens, supra. It has been the rule at least since Brown v. Humble, supra, was decided by this court in June 1935. Plaintiffs' attempt here to destroy the effect of what the courts have said in Brown v. Humble, and Ryan v. Pickens, supra, by claiming that the law of capture is nothing more than a rule of convenience or a rule of nonliability for damages for drainage. The plaintiffs, however, seem to level their attack only against Ryan v. Pickens, supra, as it indicated by the conclusion of law number 2, filed undoubtedly by the trial court at the instance of the plaintiffs. They have chosen to ignore the many other cases by this court and the courts of civil appeals.

Plaintiffs apparently are proceeding without regard to the significant holding of the court in Brown v. Humble, supra, on motion for rehearing in 87 S.W. 2d at page 1069. In its original opinion the court used language to the effect that the Commission has the duty "to adjust the allowable" so as to give the owner of a small tract "his just proportion of the oil and gas" and that by this method "each person will be entitled to recover a quantity of oil and gas substantially equivalent to the recoverable oil and gas under his land." (83 S.W. 2d at page 944).

On motion for rehearing, the court in explanation of this statement said in 87 S.W. 2d at page 1069:

"It appears that the first quotation above and a part of the second have been construed by some to mean that this court has undertaken to prescribe them as rules and standards by which to determine property rights and as standards to control the Railroad Commission in promulgating conservation rules and orders relating to oil and gas. Others have construed the language, or part of the language, above quoted from the opinion to amount to a ruling that acreage must be used as the sole or controlling factor in determining how many oil and gas wells may be drilled on, or how much oil or gas may be taken from, a tract of land, or to hold in effect that whenever a well or wells are permitted to be drilled upon a small tract under the exception in rule 37, the allowable from such wells must always be adjusted so that the tract will be permitted to produce only a quantity of oil measured by the proportion which its acreage bears to the acreage of tracts developed under the general provisions of the rule.

"These are erroneous constructions of the opinion. The language quoted was used, not for the purpose of prescribing

rules or standards, but merely in a discussion of the validity and purpose of the rule and its exception, as showing that the rule and the exception with respect to vested rights are reasonable; and that, while it is 'impossible to measure the quantity of oil and gas beneath each tract of land,' or to 'give exact justice to all land owners,' the rule and the exception can be so administered as to prevent the invasion of property rights by fairly and reasonably, but of course not exactly, protecting each owner in the ownership of, and in the opportunity to save and produce, the oil and gas which according to the decisions in this state he has a right to take."

It is plausible to conclude that Brown v. Humble stands for the proposition that the owner of a small tract is not limited simply to the oil or gas, or their equivalent, beneath his tract. The court said that the conservation laws should be administered so as to prevent the invasion of property rights by giving each owner "the opportunity to save and produce the oil and gas which according to the decisions in this state *he has a right to take.*" The court without doubt was referring to the law of capture, a property right. The opinion on motion for rehearing makes it clear that there is no basis for a claim that proration must be in proportion to either acreage or reserves in place.

I feel that it is necessary to discuss all of these cases as they have a direct bearing upon the action of the Railroad Commission in determining the issue before it. The issue before the Railroad Commission at the first hearing was the question of adoption of field rules for all four vertically separated reservoirs, the Slick Sand Field, the Luling Sand Field, the First Massive and the Second Massive Wilcox Field. This hearing was requested by Midstates, a proponent of a 100 percent acreage formula. At the hearing, Mistates offered a "waste" argument to justify the adoption of field rules and especially an allocation formula based 100 percent upon acreage times bottom hole pressure. Midstates contended that some 80 townsite lots would be drilled if field rules were not enacted and substantial "waste" would occur since (1) danger of "blowouts" would be increased and (2) the concentrated withdrawals would cause a reduction of pressure in the townsite area and there would be a "dewing out" and loss of liquids.

Atlantic apparently contended for a different formula, and presented some figures as to the amount of money that a well drilled on a town lot would produce under different allocation formulas from the Slick, Luling, and First Massive formations. However, no evidence was presented at the first hearing showing that the First Massive was productive. This accounts for the fact that in the order of December 16, 1957, field rules were

enacted for only the Slick Sand Field, the Luling Sand Field, and the Second Massive Wilcox Field. This order recited that the Commission "finds that waste as the term is defined in the applicable statutes, will take place in said field unless rules are adopted by the Commission for the prevention thereof, and the following field rules are neccessary to prevent such waste and to provide for a more orderly development and operation of said field." In this connection, a great volume of testimony was introduced by both plaintiffs and defendants, Bright & Schiff. It would be impractical to attempt to set out all the testimony. It is sufficient to say that in my opinion the orders complained of are reasonably supported by substantial evidence and are not illegal, unjust, arbitrary, unreasonable, or discriminatory. I may add that the finding of fact by the trial court that "Production of gas and condensate from the well drilled by defendant Bright & Schiff * * * under the rules of the * * * Railroad Commission * * * prorating [2/3-1/3 formula] the production of gas from the reservoirs in the Normanna Field, Bee County, Texas, will result in the drainage of a tremendous quantity of gas and condensate from other leases and tracts in the field, including leases and tracts in which plaintiffs own an interest *to* said .3 acre [Bright & Schiff] lease, * * *" cannot be material because the plaintiffs wholly failed to prove their theory. The plaintiffs failed to make out their case for calculating the reserves and the production to the Bright & Schiff well, in that the finding of the trial court shows that they failed to prove the amount, whatever that amount may be, of drainage. The court said in its finding "the precise amount of said drainage being incapable of ascertainment." The plaintiffs should not be permitted to destroy the orders of the Railroad Commission merely because of an irrelevant finding made by the trial court to the effect that a tremendous quantity of gas and condensate from other leases in the field will be drainage to the .3 acre Bright & Schiff tract. No showing was made as to the quantity of drainage, if any, which would flow from plaintiffs' leases. There is no way of knowing from the evidence what quantity of gas or condensate would flow to the plaintiffs' leases as a result of their drilling operations. On the other hand, Bright & Schiff witnesses testified to facts showing conclusively that no drainage could be computed and no field reserves could be computed "at this time." If a question of fact was presented as to whether or not reserves can be computed, then such question of fact must be determined in the first instance by the Commission. The case of Corzelius v. Harrell, 143 Tex. 509, 186 S.W. 2d 961, supports the contention of the defendants that the power to make rules rests exclusively with the Commission and the courts may only adjudge that a rule of the Commission is valid or invalid. The courts cannot make new rules, and by the same token cannot determine fact

issues in the first instance. The alternative argument made by the plaintiffs to the effect that there is tremendous drainage or "enormous drainage" cannot prevail. In the first place there are no pleadings raising such question — next, the finding of "tremendous drainage" or "enormous drainage" is indefinite, ambiguous and cannot be the basis for a workable order by the Railroad Commission, the agency responsible for the administration of the oil and gas laws in the State of Texas. What I have said applies with equal force to the second order. This order following Atlantic's request to the Commission on January 26, 1958, for the adoption of special field rules for the First Massive Sand. The only additional evidence to that presented at the first hearing was that the First Massive was then in production. This was a "waste order" like the first order. Neither of the orders were "correlative rights" orders. No evidence was introduced at either hearing concerning the market demand or any prospective market demand. Likewise, no finding was made by the Commission as required by Article 6008, Section 11, Vernon's Annotated Civil Statutes, that "the aggregate lawful volume of the open flow or daily potential capacity to produce of all gas wells located in" each common reservoir was "in excess of the daily reasonable market demand from gas wells that may be produced" from such reservoir. This matter is given emphasis in order that the court will know that the orders of the Commission now under consideration are strictly "waste orders" and that the rules were entered solely for the purpose of preventing "waste". The Commission was presented with no evidence to support a "correlative rights" order under Article 6008, supra. The first time the plaintiffs attempted to present a case based upon the "correlative rights" was when they presented evidence before the District Court that the sum total of the potentials for all of the wells excluded any reasonably expected market demand for gas. The Commission and the District Court have rejected plaintiffs' argument that the reference in Article 6008, supra, to the adjustment of "correlative rights" means that "the Commission should allow each producer to produce ultimately an amount of oil or gas substantially equivalent to that in place beneath his tract." The contention was rejected because the plaintiffs failed to discharge their burden on the only issue and that was to establish that their "waste" formula was supported by substantial evidence. Attention is again directed to the fact that regardless of what was meant by the term "adjust correlative rights" as contained in Section 11, Article 6008, and even if plaintiffs' version is correct (which I do not admit), the Commission has never invoked its jurisdiction under Section 10 (b) of said Article. Section 10 of Article 6008 requires the Commission to prorate and regulate production (a) in the prevention of "waste", and (b) "in the adjustment of correlative rights and

opportunities of each owner of gas in a common reservoir to produce and use or sell such gas as permitted in this Article". If you will read the second paragraph of Section 11, Article 6008, supra, you will readily ascertain that the Commission only exercises its authority to accomplish the purpose designated under item (b) [adjustment of correlative rights] *"When evidence introduced at a hearing [for that purpose] will support a finding made by the Commission that the aggregate, lawful volume of the open flow or daily potential capacity to produce of all gas wells located in a common reservoir, as in excess of the daily reasonable market demand for gas from gas wells that may be produced from such common reservoir, to be utilized as permitted in this Article."* The opinion of the majority constitutes a departure from the well-established rules of procedure as laid down by the statutes governing the Commission in adopting field rules. I trust that other members of the Court will join me in admitting our grievous error in basing our original opinion upon the theory of adjustment of correlative rights, when plaintiffs failed to introduce any evidence supporting such theory.

In the case of Brown v. Humble, supra, this Court, in discussing the rules of ownership of oil and gas in place and the rule of capture, a property right, said that "Both rules are subject to regulation under the police power of the state." However, the Commission has no authority in the exercise of the police power to inject issues into the hearing which are not raised by the pleadings and the evidence. Since the "correlative rights" issue has never been presented to the Commission, this Court is without jurisdiction to consider much less reverse the case on such grounds. We have here the sole question of whether the orders of the Commission are supported by substantial evidence. The plaintiffs have elected to request the Commission to act only under the "waste" prevention powers granted to it under item (a) of Section 10 or under Section 7 of Article 6049c, relating to waste.

I realize that a great fight is being waged against the substantial evidence rule. The majority opinion in this case lends itself to the theory which has never before been recognized that the courts through judicial review have the authority not only to substitute their judgment or discretion for that of the Commission, but to go a step further and test the validity of the Commission's order on a matter which was not raised before the Commission. It has long been held that the courts will set aside a Commission order only where it deprives the complaining party of property rights. See Railroad Commission v. Rowan & Nichols Oil Company, 310 U.S. 573, 60 S. Ct. 1021, 84 L. Ed. 1308; Railroad Commission v. Rowan & Nichols Oil

Company, 311 U.S. 570, 61 S. Ct. 343, 83 L. Ed. 358. While it is true that in these cases the primary attack on the orders was on the basis that the proration orders deprived the owners of larger tracts of their property without due process of law in violation of the Fourteenth Amendment to the United States Constitution, nevertheless, these cases definitely decided that even a straight proration order, in view of the Texas Law of property, including the law of capture, did not constitute a taking of the property of the large tract owners. These cases involved proration orders for the East Texas field. They definitely settled the validity of the Commission's proration order in the East Texas field, where proration was and still is substantially on a per well basis. In those cases, as in this case, the contention was made that the proration order was invalid because it enabled the owners of wells on small tracts to drain away oil beneath the larger tracts. The Court in both cases carefully considered the Texas cases, including Brown v. Humble, supra, and stated the Texas law as it had been announced in this latter case. The Court said in the first Rowan case:

"In Texas, according to conventional doctrine, the holder of an oil lease 'owns' the oil in place beneath the surface, * * * But equally recognized is the 'rule of capture' which subjects the lessee's interest to his neighbors' power to drain his oil away. Therefore, to speak of ownership in its relation to oil, is to imply a contingency of control not applicable to ordinary interests in realty."

The Commission in determining the issue of waste must necessarily be guided by the case law on the subject. It, no doubt, in considering the type of order to be entered here, took into consideration the reasoning of the Court in the first Rowan case wherein it said " * * * To deny the holders of these [small] tracts permission to drill might subject them to the risk of losing their oil in place or of being put at the mercy of adjoining holders. [compulsory pooling]. In many instances, therefore, the Commission has granted exceptions to its general spacing rule on the basis of which investments have been made and wells drilled. If these wells, most of them small, were restricted to production on the basis of an hourly potential formula, it might be unprofitable to operate them at all. *Not only are the individual interests of these small operators involved,* but their effect on the State's economy is an appropriate factor to be taken into account when plans are devised to keep the well open."

The only case in which the Supreme Court of Texas has nullified a proration order of the Railroad Commission is Marrs

v. Railroad Commission, 142 Tex. 293, 177 S.W. 2d 941. The proration formula in that case was on the basis of 50 percent per well and 50 percent average potential productivity as applied to unitized acreage and other factors. The basic premises of the Marrs opinion that the trial court had a right to make an independent review of the evidence, was expressly overruled by this Court in Trapp v. Shell Oil Company, 145 Tex. 323, 198 S.W. 2d 424, 434. The Marrs case was a departure from the substantial evidence rule. Not only that, it completely ignored the law of capture as a part of the law of property in oil and gas. It should be noted, also, that the complaining parties in that case were not "free to fend for themselves". It was in the light of this situation that the Court emphasized that each owner is entitled "to a fair chance" to recover such oil and gas and that the denial of "such fair chance" amounted to confiscation. In our case, we do not have a situation where the plaintiffs cannot fend for themselves. The plaintiffs, instead of developing their tracts separately as they had a right to do, have voluntarily elected to pool their tracts. I think it is not unreasonable to say that they elected not to drill eighty wells in order to save themselves drilling and operating expenses. The drilling of ten or eleven wells, of course, is much less expensive than the drilling of eighty, thereby making it more profitable for, the plaintiffs. If the plaintiffs can compel the defendant, Bright & Schiff, under the guise of "correlative rights" to suffer a drastic reduction in the allowable assigned to its well, then they will make even a still larger profit.

Although the Court in the present case recognized the applicability of the substantial evidence rule, yet, it failed to apply it. Such failure, together with an unintentional misintepretation of the authorities, has again led us into the repudiated Marrs, supra, and we have forgotten the generally recognized fact that where the order of the agency under attack involved the exercise of the sound judgment and discretion of the agency in a matter committed to it by the legislature, the Court will sustain the order if the action of the agency in reaching such conclusions is reasonably supported by substantial evidence. See Alamo Express v. Union City Transfer, Tex. 309 S.W. 2d 815, 822, 823.

It is well for the courts to review and keep constantly in mind that the issue is not whether or not the Commission came to the proper fact conclusion on the basis of conflicting evidence, but whether or not it acted arbitrarily and without regard to the facts. It is well to remember that the Court does not act as an administrative body to determine whether or not it would have reached the same fact conclusions that the Commis-

sion reached, but will consider only whether the action of the Commission in its determination of the facts is reasonably supported by substantial evidence. The question is one of law. To permit the Court to substitute its fact finding on the controverted issues of fact (issue of waste) we have here destroys all uniformity of Commission administration. See 31A Tex. Jur. (Oil and Gas) Sec. 431, p. 758.

It is also necessary to remember that the validity of the orders involved is to be tested by the conditions as they existed at the time the orders were made, and is not to be tested by the conditions on appeal. The orders are the subjects of review. The Commission lost jurisdiction when the orders were appealed. It might be well to recall our recent opinion in Southern Canal Company v. State Board of Water Engineers, Tex. 318 S.W. 2d 619, wherein it was declared that the legal test of reasonableness of an order of an administrative agency is whether it is reasonably supported by substantial evidence and not whether it is supported by a preponderance of the evidence, and, an administrative order is reasonable, as a matter of law, if it is supported by substantial evidence. This declaration of the proper legal test followed the Trapp case, supra, rather than the Marrs case, supra.

It is only where the evidence as a whole is such that reasonable minds could not have reached the conclusion that the agency must have reached in order to justify its actions, that the order must be set aside.

The preceding sentence has been lifted from this Court's opinion in the Trem Carr case, Railroad Commission v. Shell Oil Co., 139 Tex. 66, 161 S.W. 2d 1022, 1029. In addition, the following from the Trem Carr case was quoted with approval in the Trapp case, supra, at page 441:

" * * * In such a case the issue is not whether or not the agency came to the proper fact conclusion on the basis of conflicting evidence, but whether or not it acted arbitrarily and without regard to the facts. Hence it is generally recognized that where the order of the agency under attack involves the exercise of the sound judgment and discretion of the agency in a matter committed to it by the Legislature, the Court will sustain the order if the action of the agency in reaching such conclusion is reasonably supported by substantial evidence. *This does not mean that a mere scintilla of evidence will suffice, nor does it mean that the Court is bound to select the testimony of one side, with absolute blindness to that introduced by the other.* * * *

"The authority to regulate the natural resources of oil and gas is in virtue of Section 59 (a) of Article XVI of the Constitution. The problem of conservation of these resources has been recognized by this Court to be 'complex', 'intricate', and 'exacting'. Corzelius v. Harrell, 143 Tex. 509, 186 S.W. 2d 961, and authorities there cited. It is not the function of this Court to pass upon the wisdom of delegating authority to administrative agencies. That is a legislative function. It has been previously stated by this Court that 'the Railroad Commission must be fair and render justice to the parties.' When the Commission fails in its duty, we should have no hesitancy in declaring its order or rule invalid but, under the decisions of this Court and on the evidence which we summarized according to the views of the respective parties in this case, it clearly appears that the action of the Railroad Commission in granting the permit in review is reasonably supported by substantial evidence. In such a case the trial court should not substitute its judgment for that of the Commission." [Emphasis added.]

In the present case and in the light of the evidence presented by both parties, and in view of the decisons of this Court, I cannot see that the Commission *failed in its duty in* making the orders under review.

There is substantial evidence to uphold the orders of the Commission. It is to be noted from the evidence that because of the exceptional faulting in the field otherwise recoverable gas in the field would be lost to the detriment of the lessees, the landowners, and the State, if Rule 37 were not applied, as required.

It seems to me that the 1/3 per well factor is sound. The drilling of wells, as stated by the Honorable James A. Ludlum in his brief, provides the only real "known" and it is the per well factor that gives the inducement to take the costly chance and drill the well. "It affords a reasonable pay-out and is effective in determining underground reservoir conditions and the limits of the field. It furnishes the assurance that in a field of this type oil or gas will be sought, discovered and utilized, for the benefit of all." I agree with Mr. Ludlum's statement that "In this case the 1/3 per well allowable does not mean that a well on a small tract will get, under that factor, as much gas as is allowed a full unit under the 1/3 per well factor. The smaller the amount of acreage assignable to a well, the less credit the well gets on the 2/3 acreage factor, and certainly a well on a fraction of an acre would receive an insignificant allowable return from that portion of the formula."

Thus, there is no justification for the conclusions we reached in our original opinion relative to the particular economics of the well on the Bright & Schiff lease. The field must be viewed as a whole and not just from the standpoint of one small tract in the field.

Section 22 of Article 6008, supra, gives the Commission broad discretion in administering the law. Under that Section the commission is vested with "a broad discretion in administering this law, and to that end shall be authorized to adopt any and all rules, regulations or orders which it finds are necessary to effectuate the provisions and purposes of said law." The paramount and controlling importance of this Section over the other sections of Article 6008, does not seem to have been fully appreciated when we wrote our original opinion.

I agree with the defendants and the able briefs in support of their motion for rehearing that the result sought by the plaintiffs can only be obtained through the Legislature. The way was expressly pointed out by this Court more than five years ago in Ryan v. Pickens, supra. If what was said there came as a shock to some of the oil fraternity, surely they have had ample time to obtain their remedy. The plaintiffs boldly advocate here compulsory pooling, yet, the Legislature has met in 1957, 1959, and 1961, without enacting statutes such as were adopted in Mississippi, and discussed in Ryan v. Pickens, supra.

This Court has, through the years, with the exception of the Marrs case, consistenty refused to destroy existing property rights, and has throughout all the litigation involving oil and gas upheld the orders of the Commission when supported by substantial evidence.